THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
WILLIAM SORICE, Defendant-Appellant.

First District (5th Division)   No. 1—87—1343

Opinion filed May 5, 1989.

Ettinger & Pechter, Ltd., of Oak Lawn, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Inge Fryklund and James E. Fitzgerald, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE MURRAY delivered the opinion of the court:

After a jury trial, defendant William Sorice was found guilty of conspiracy to commit a burglary and burglary and sentenced to four years' imprisonment. On appeal, he contends: (1) the trial court erred in denying his motion to suppress evidence; (2) he was denied a fair

trial because the prosecutor elicited testimony suggesting prior criminal conduct by him; (3) the trial court erred in permitting a Chicago police department criminologist to testify concerning certain evidence; (4) he was not proved guilty beyond a reasonable doubt; (5) he was denied a fair trial because the prosecutor commented on his silence during closing argument; (6) he was substantially prejudiced because of an improper communication to the jury which impermissibly hastened its verdict; and (7) the court abused its discretion in sentencing him to four years' imprisonment. For the reasons set forth below, we affirm in part and reverse in part.

The record discloses that at a hearing on defendant's motion to suppress, he testified that on February 10, 1985, he was employed as a Chicago police officer and worked the third watch out of the 12th District (3 to 11:30 p.m.), at which time he had his service revolver with him. On February 11, at 7:30 a.m., two uniformed and two plainclothes police officers came to his home. The officers told him that someone had been found with his identification card and badge. He was asked to accompany the officers to the 12th District police station and said, "O.K." At the station, he filled out a "to-from report." He did not recall if he stated therein that he had lost his car, identification, gun, and house and car keys. He also did not know if his gun was lost or stolen and only knew that his car was missing because he did not know where he had parked it. Defendant further related that he went from the 12th District to Area 4, where he signed some complaints for the theft of his star and identification because an officer informed him that they were not in his car, which the police had subsequently located. He was also informed that his car had been towed at 8:30 that morning from a parking lot of the Lawrence Fishery at 22nd and Canal in Chicago and that the tow operator could not stop laughing because of the large number of empty beer cans and bottles that were in the backseat.

Sergeant Melvin Bynum, a Chicago police officer assigned to the Internal Affairs Unit, Confidential and Corrupt Police Practices Section, testified that he went to defendant's home on February 11 with other officers. He told defendant he was needed at the 12th District in regard to the burglary of a jewelry store which had occurred earlier that morning and that one of the offenders had been found with his identification and star. On the way to the station, defendant told Bynum that he had no idea where his identification and star were, that he had bought a six-pack and had been drinking, he could not recall what happened to his car or gun, and that the last time he saw his revolver it was in his car; Bynum did not include this conversation

in his report. Bynum further stated that he and a fellow officer were ordered to locate defendant's car to see if his gun was in it inasmuch as his badge and identification had been recovered. They found the car in the Lawrence Fishery parking lot. After brushing some snow off the car window, Bynum saw that the inside was in disarray. He then used a coat hanger to gain entry into the car. He found defendant's loaded gun under the front seat of the vehicle, as well as a lock puller, jumper wires, and a set of lock fix, which were in "plain view" adjacent to the gun. He also observed a pair of coveralls and a knit hat in the back section of the car. Defendant's car was subsequently towed to the police station and the items found therein inventoried by someone other than Bynum.

Based on the foregoing, the trial court denied defendant's motion to suppress, finding the exigent circumstances excused the warrantless search of defendant's car. Prior to trial, the court also granted defendant's motion *in limine* barring the State from introducing any evidence regarding defendant's alleged involvement in the attempted burglary of a currency exchange.

At trial, police officer Thomas Hughes testified that he and another officer were ordered to investigate a burglary at the Princessa Jewelry store located at 1650 West 18th Street in Chicago. When they arrived at the store, they saw some footprints in the newly fallen snow coming out from the rear of the store, up on a porch, and in the areaway between two garages and then out into an alley. Once on the porch, Hughes observed wires hanging down from the side of the building and an iron gate and wooden door to the rear of the building were standing open. After entering the store they found a large safe with its doors and drawers open, a glove in front of it, and various tools for "peeling" open the safe.

The police notified the owner of the store, Jesus Amaya. Amaya subsequently testified at trial that upon arriving at the store he found showcases broken, the safe open and the store in complete disarray. The value of the goods taken amounted to $216,000. Amaya identified defendant as someone who had come into the jewelry store dressed in his uniform several times before the burglary, *i.e.*, January 1985, a week later, and on a Friday in February just prior to the burglary. On the first occasion, defendant brought a Timex watch in to be repaired, the second time he stayed for 10 to 15 minutes and asked if the store carried 14k or 18k gold and what the quality of it was and the price of a chain and ring, and on the last occasion defendant came in, looked around the store and told Amaya that he had a couple of gold chains he was going to bring in to be repaired. Approximately two

weeks before the burglary, defendant also told Amaya about some strange men he had seen standing around on the second-floor landing of the store.

Steven Manning also testified on behalf of the prosecution. Manning was a former police officer who was discharged from the department in 1983 after he pleaded guilty to theft and official misconduct. When he was arrested for the burglary at issue here, he was on probation. He pleaded guilty to the violation of probation petition and was sentenced to four years' imprisonment. Manning further testified that he first met defendant in June or July 1984 at a restaurant; in September 1984 he and defendant met at another restaurant and defendant asked him if he was interested in a "score" ("illegal payday" or a burglary) during which his only function would be to act as a lookout; and he and defendant continued to converse by telephone throughout the fall and into the winter, contacting each other through beepers and using pay phones.

On February 4 or 5, 1985, defendant called Manning and said he should prepare himself because defendant had a score available. They subsequently met each other at that time at the Lawrence Fishery located at 2120 South Canal. During their conversation, defendant told Manning that he had a jewelry store set up and that they would take it within a week. Defendant told him he would receive $1,000 for his role as lookout. They were to use Manning's Lincoln town car because it was official looking and defendant directed him to get valid license plates which did not check out to him.

On February 9, Manning received a page from defendant. When he called defendant, defendant told him that they were going to score the next night, to meet him at the Lawrence Fishery after the third watch at 11:30 or 11:45 p.m., to bring a scanner to monitor the police ban, and to bring his Lincoln town car. Manning arrived at the Fishery the next evening at 10:30 p.m.; defendant arrived at 11:45 p.m. in his own car; defendant got out of his car, said hello to Manning, took a bag out of his car trunk and put it in Manning's trunk; defendant got into Manning's car and gave him directions to the area of 18th and Ashland; and defendant told Manning not to worry because they were in the 12th District and he knew most of the police officers in the area. When they arrived at the jewelry store, defendant told Manning to park across the street. Defendant then instructed Manning to listen to the scanner, which was tuned to the band for the 9th and 12th Districts; that if he heard or saw anything he was to sound the car horn or set off the car's alarm system; and that if there was a problem he was to tell the police that defendant was down the street

having sex with some girl. Defendant, after telling Manning that he was going to leave his star and identification in Manning's car, got out of the car, took the bag from the trunk, and left. Manning's car was facing east when he saw defendant go north across the street in the direction of a Clark gas station, which was located next to the Princessa Jewelry store.

At approximately 2 a.m., a squad car passed Manning's car. Manning froze for a moment, then reached for the car's inoperable mobile telephone and feigned making a phone call. The squad car made a U-turn, pulled up alongside Manning's car, and two police officers got out of the car and told Manning to do the same. Manning asked the officers what the problem was and informed them he was an ex-police officer and that he was making a phone call while waiting for a friend. The officers told Manning that if he was an ex-police officer he would not mind them searching his car and Manning then consented to a search. Thereafter, one of the officers found the scanner with an earplug and defendant's badge, identification and beeper. Manning informed the police that the owner of the badge, whom the officers knew, was down the street with his girl friend.

The officers arrested Manning and took him to the 12th District and then to Area 4 headquarters, where he saw defendant in another room. Initially, Manning told the police he had no comment other than he did not steal the badge recovered from his car. However, after defendant signed complaints for the theft of his star, Manning agreed to answer questions and to testify before the grand jury. He subsequently gave an oral statement to the police, which was written down, telling them he was involved in a burglary with defendant. Manning further stated that defendant never told him he could use his badge and identification and that is why he did not show them to the arresting officers; he left his position opposite the jewelry store on two or three occasions; he did not know what defendant took out of the trunk of his car once they got to the jewelry store; and he did not see defendant enter the jewelry store.

Chicago police officer Donald Johnson testified that on February 11 it was snowing heavily and around 2 a.m. he and a fellow officer observed a car parked on the street without any snow on it. They drove up to the car and confronted the occupant—Manning. They asked Manning what he was doing and he responded he was making a phone call, they asked him if he lived in the neighborhood and he responded he was an ex-police officer, they asked him if he still carried a weapon and he responded that he did not, and they asked him if there was a weapon in the car and he said no and to take a look.

Upon searching the car, they found a wallet with a police star and a beeper. One of the officers knew the police officer named on the star and identification and asked Manning where the officer was, to which Manning responded that he was upstairs with some girl, pointing to a row of houses. Manning was then placed under arrest for possession of stolen property—the police star.

Geraldine Roman, a personnel manager of Rogers Radio Communications, d/b/a Metromedia Paging, also testified for the prosecution. She stated that she keeps the business records of the company, that the People's exhibit 3, a Metromedia pager, was rented by defendant in 1984 and that he was still renting it on February 10 and 11, 1985. Finally, she identified People's exhibit 44 as a work order dated March 7, 1985, wherein defendant stated that the beeper had been lost.

The State also called Ray Lenz, a criminologist of the Chicago police department's crime lab, to testify as an expert. He stated that a fiber on a glove found in the jewelry store was very similar in cross-sectional shape as well as in other materials to fibers found on the coveralls recovered from defendant's car. It was his opinion that the fiber on the glove could have originated from the coveralls and that there were no differences which were apparent that would lead him to believe that the fiber definitely did not originate from the coveralls.

The jury subsequently found defendant guilty of the crimes charged, he was sentenced to four years' imprisonment, and this appeal followed.

Defendant first argues that, contrary to the trial court's ruling, exigent circumstances did not exist to excuse the warrantless search of his car and, accordingly, it erred in denying his motion to suppress. Defendant distinguishes his circumstances from those in *Cady v. Dombrowski* (1973), 413 U.S. 433, 37 L. Ed. 2d 706, 93 S. Ct. 2523, upon which the trial court relied in denying his motion. In *Cady*, the defendant, a Chicago police officer, was driving his car in Wisconsin when it went through a guard rail and crashed into a bridge abutment. A passing motorist drove defendant to a telephone, defendant called the Wisconsin police and informed them he was also a police officer, and the Wisconsin police, upon returning defendant to his vehicle, noticed that defendant appeared drunk. The Wisconsin officers, believing that police officers are required to carry their service revolvers at all times, subsequently searched defendant and his car at the scene of the accident but did not find the weapon. The defendant's car was then towed to a private garage where it was left outside without a guard, and the defendant was taken to a hospital where he

lapsed into a coma. The police subsequently returned to the defendant's vehicle and continued their search for his revolver. In searching the locked trunk of the defendant's car, they came upon other evidence which implicated the defendant in a murder. In upholding the search of the defendant's car, the Supreme Court stated:

> *"First, the police had exercised a form of custody or control over the 1967 Thunderbird.* Respondent's vehicle was disabled as a result of the accident, and constituted a nuisance along the highway. Respondent, being intoxicated (and later comatose), *could not make arrangements to have the vehicle towed and stored.* At the direction of the police, and for elemental reasons of safety, the automobile was towed to a private garage. Second, both the state courts and the District Court found as a fact that the search of the trunk to retrieve the revolver was *'standard procedure in [that police] department,'* to protect the public from the possibility that a revolver would fall into untrained or perhaps malicious hands. Although the trunk was locked, the car was left outside, in a lot seven miles from the police station to which respondent had been taken, and no guard was posted over it." (Emphasis added.) (*Cady v. Dombrowski* (1973), 413 U.S. 433, 443, 37 L. Ed. 2d 706, 715-16, 93 S. Ct. 2523, 2529.)

In the instant case, defendant argues that the Court's reasons for upholding the search, as indicated as italicized above, are not present under the circumstances here, *i.e.,* initially the police had not exercised any control over his vehicle and it was not disabled in any way, he was not disabled, and no evidence was presented that it was standard procedure for the police to protect the public from the possibility that a police officer's weapon might fall into untrained or malicious hands.

■■ ■ We find that while it is true that the *Cady* Court in part based its rationale for upholding the search of the defendant's car on the established standard procedure in Wisconsin, we do not find that the absence of evidence to show a similar standard of procedure under the circumstances here affects the action of the police based on their most fundamental duty as law enforcement officers—to act to protect the public. Moreover, it is well settled that the criterion for determining the existence of an emergency to justify a warrantless search depends on a police officer's reasonable belief that an emergency exists, not the existence of an emergency in fact. The reasonableness of the officer's belief is determined by the entirety of all the circumstances known to him at the time of a warrantless entry. (*Peo-*

*ple v. McGee* (1986), 140 Ill. App. 3d 677, 489 N.E.2d 439.) In the present case, defendant did not know where his badge and identification were, where his car was or where his gun was. He stated that he last remembered having his gun in his car. Although the police had found the person who had his badge and identification, it did not necessarily follow that the same person might have taken his gun— defendant could have misplaced or lost each separately. Additionally, since defendant did not know where he had parked his car because he had been drinking the night before, it could be presumed that he had not necessarily locked his car, that his gun was loaded and was in the car, and that anyone with malicious intent or otherwise could enter his car and take the weapon. We further observe that even though defendant was not under arrest, his immediate presence was required at the station to make out the to-from report and various complaint forms and, at the time, he had no immediate transport to go looking for his car and gun. Under the circumstances, therefore, we believe *Cady* is applicable to the facts here and the facts in and of themselves presented exigent circumstances to justify the police officers' warrantless search of defendant's car. We thus do not find that the trial court's denial of defendant's motion to suppress was manifestly erroneous. See *People v. Hoskins* (1984), 101 Ill. 2d 209, 461 N.E.2d 941.

■■ Defendant next contends that he was denied a fair trial by the elicitation of improper testimony by the State suggesting prior criminal conduct by him. Prior to trial the court granted defendant's motion *in limine* to bar the State from introducing any evidence concerning defendant's alleged involvement in the attempted burglary of a particular currency exchange. Specifically, the court ordered that "[t]here will be a motion *in limine* with regards to the State offering any evidence as to *other crimes* in the trial of the matter." (Emphasis added.) Despite the allowance of the motion, the State, on its direct examination of Manning, elicited from him that during a conversation with defendant, defendant "mentioned something about a screw-up with a currency exchange." The State contended in a conference outside of the jury's presence that reference to the currency exchange matter by Manning through his relation of his conversation with defendant was an admission by defendant and therefore was not "covered" under defendant's motion *in limine*. Clearly this "misunderstanding" of the nature of defendant's motion violated the spirit if not the words of the trial court's order granting the motion. The State's elicitation of this testimony was undisputably improper and, if this were a close case on the issue of guilty, would have entitled defendant to a new trial. (See *People v. Harbold* (1984), 124 Ill. App.

3d 363, 464 N.E.2d 734 (it is fundamental that a defendant must be judged on the particular charge before the trier of fact and not on his "evil character"); *People v. Harges* (1967), 87 Ill. App. 2d 376, 231 N.E.2d 650 (no question is more damaging to a defendant with a jury than one that suggests or intimates that he is a criminal or has been charged with criminal offenses).) However, this was not a close case on the issue of guilt, as is discussed more fully below, and the error was cured by the trial court's instructed to the jury to disregard Manning's testimony relative to the currency exchange reference.

■■ ■ Defendant also argues that the trial court erred in permitting a police department criminologist to testify as to his opinion regarding the origin of a fiber found on a glove at the scene of the burglary with the fibers of the coveralls found in defendant's car because the expert's opinion was based upon mere conjecture and speculation. (See *People v. Hester* (1968), 39 Ill. 2d 489, 237 N.E.2d 466 (expert testimony which is merely speculative is incompetent and therefore inadmissible).) We disagree. "An individual will be permitted to testify as an expert when his experience and qualifications give him knowledge which is not common to the world and where his testimony will aid the [trier of fact] in reaching its determination." (*People v. Beil* (1979), 76 Ill. App. 3d 924, 929, 395 N.E.2d 400.) Here, as the State points out, its expert gave an exhaustive explanation of the tests he performed on the coveralls' material, he stated that the fiber on the glove and the fibers from the coveralls were very similar in cross-sectional shape and in material makeup, and that there were no differences which were apparent that would lead him to believe that the fiber definitely did not originate from the coveralls. Clearly, the State's expert's testimony was not mere speculation as defendant asserts, but rather an opinion based on proven accepted scientific analysis necessary to aid the trier of fact.

Defendant next argues that he was not proved guilty beyond a reasonable doubt. He contends that Manning's testimony failed to adequately connect him with the burglary of the jewelry store; *i.e.*, that Manning did not testify as to any specific conversation with defendant regarding a burglary of the Princessa Jewelry store but only to Manning being a "lookout" for a "score" and that Manning did not observe defendant enter the store but only observed him go in the direction of the store. Defendant further asserts that Manning had a motive to testify falsely because, if he did not testify, the State would leave his sentence up to the court, he was not worthy of belief based on his prior commission of automobile insurance fraud which involved deceit, and he disobeyed a court order by going to Germany without

leave of court and while on probation. Additionally, defendant contends that the State's expert's testimony that a fiber found on the glove discovered at the scene of the burglary "could have" originated from the coveralls found in his car deserved little or no weight in proving him guilty, nor the fact that defendant had been a customer at the jewelry store. Defendant finally asserts that his fingerprints were not found at the scene and no proceeds taken in the burglary were recovered from him, his vehicle or his residence. Accordingly, defendant argues that the evidence against him was merely circumstantial and insubstantial to establish his guilt beyond a reasonable doubt.

■ Contrary to defendant's argument, as the State points out, circumstantial evidence is sufficient to support a conviction. (See *People v. Rhodes* (1981), 85 Ill. 2d 241, 422 N.E.2d 605.) In the instant case, the testimony of the State's witnesses indicated as follows: the Princessa Jewelry store was burglarized sometime between late evening on February 10 and early morning on February 11; Manning testified that he and defendant had been discussing a "score" for several months and that he would be a lookout and receive $1,000 for his services; on February 9 defendant told Manning they would score the next night, to meet him at the Lawrence Fishery at 11:30 p.m., and to bring a scanner and his Lincoln town car with fictitious license plates, which Manning did; defendant's car was found in the parking lot of the Lawrence Fishery where Manning told police he and defendant had met prior to the burglary; Manning was discovered by the police sitting in his car across the street from the burglarized jewelry store at 2 a.m. on February 11, minutes after other police officers discovered that the store had been burglarized; defendant's badge, identification and a beeper rented to him were discovered in Manning's car, none of which had been reported stolen by defendant prior to the burglary; and the fiber found on a glove discovered in the burglarized store was determined by the State's expert to be without any apparent differences from the fibers obtained from the coveralls found in defendant's car. We further note that the jury was aware that Manning stood to benefit if he testified truthfully for the prosecution. Based on the foregoing, we find that it was not unreasonable for the jury to conclude, beyond a reasonable doubt, that defendant was guilty as charged.

Defendant also contends that he was denied a fair trial when the State allegedly commented on his silence during closing argument, *i.e.*:

"[ASSISTANT STATE'S ATTORNEY]: Where was this glove,

probably in the pocket of these coveralls, and the defendant pulled this glove out of the coveralls when he went to do the burglary. He had the glove with him because he didn't want to have prints left behind. *That's when he went to do the burglary with Steve Manning.*

*He didn't do the burglary with a reputable citizen, and note how he did not, did not come forward with the truth, initially. Well why should he—*

[DEFENSE COUNSEL]: Objection, I object to that and I would like to be heard. I move, I move for a mistrial. I object to that.

[THE COURT]: Motion for a Mistrial will be denied, and counsel, the jury will be instructed to disregard that." (Emphasis added.)

■■ ■ It is well settled that the prosecution is prohibited from commenting on a defendant's failure to testify at trial. (*Griffin v. California* (1965), 380 U.S. 609, 14 L. Ed. 2d 106, 85 S. Ct. 1229.) Here, the State argues that the complained-of comment referred to Manning, not defendant, as borne out by the fact that in the last sentence of the first paragraph quoted above the State was discussing "Steve Manning." The State further asserts that its comments immediately following the complained-of remark supports its contention, *i.e.*:

"[ASSISTANT STATE'S ATTORNEY]: Steve Manning did not come forward with the truth initially. Steve Manning went to the police department. Now where [*sic*] is a man the defense would have you to believe wanted to make a deal with me. He wanted to make a deal with this case.

Why didn't he make a deal right off the get go, why didn't he come forward right off the get go and say this man the defendant, William Sorice, that is the man that did the burglary with me. Why didn't he do that? He didn't do that because there was still a deal going on at that point between the two men ***."

In other words, the State was referring to the evidence that Manning did not initially tell the truth; he did not tell the police about his and defendant's collusion in the burglary until late February 11 when defendant signed the complaints stating his badge and identification had been stolen. Based on the record, therefore, we agree with the State that the objected-to reference was directed toward Manning, not defendant.

Defendant next contends that he was substantially prejudiced because of an improper communication to the jury which impermissibly

hastened the jury's verdict. While the jury was deliberating, the following exchange took place in the courtroom between the court and counsel:

"[THE COURT]: We have had a conference with regard to the equestering [*sic*] of the jury for the evening. It is now approaching 9:30. I have discussed with both counsel for the defendant and counsel for the state and I have indicated to them that I would give to jurors the following instruction; 'You are hereby advised that the jury is now going to be sequestered for the evening and Court will resume at 9:00 o'clock tomorrow.

You are hereby directed to cease all deliberations, and you are further directed not to discuss the evidence or the testimony in this case until you are directed to resume your deliberation tomorrow morning.'

Is that correct, Mr. Banks?

[DEFENSE COUNSEL]: That's my understanding, Judge.

[THE COURT]: Mr. Gardiner?

[ASSISTANT STATE'S ATTORNEY]: Yes, Judge, that is fine.

[THE COURT]: And last, I have indicated that all of the exhibits that are back in the jury room with the jurors and the instructions will be placed on the cart and they will be locked in my chambers.

Ready?

[ASSISTANT STATE'S ATTORNEY]: They would like to know if they can have 10 or 15 more minutes.

[THE COURT]: Yes. Tell them 10 or 15 more minutes.

(A further recess was taken while the jury deliberated, after which the following proceedings were had:)

[THE CLERK]: The People of the State of Illinois versus William Sorice.

[THE COURT]: Please be seated.

In the matter of the People versus William Sorice, let the record reflect that the Defendant and his attorneys are present in court, as are the state's attorneys and all 12 jurors are present in the jury box.

Mr. Foreman, has the jury reached a verdict?

[THE FOREMAN]: Yes, your Honor.

The Defendant was found guilty of conspiracy and burglary."

The State argues that this issue is waived because defendant failed to

object at that time, as well as in his post-trial motion for a new trial. (See *People v. Carlson* (1980), 79 Ill. 2d 564, 404 N.E.2d 233.) It also asserts that the above colloquy is devoid of any indication that it, a bailiff or some other party in fact communicated the impending sequestration to the jury and, therefore, that defendant's argument is mere speculation.

We first observe that notwithstanding defendant's failure to object to this alleged error at trial or in his post-trial motion, we could consider the complained-of error under the plain error rule if applicable. (107 Ill. 2d R. 615(a).) However, based on the record, we must agree with the State that there is no evidence that any communication concerning the sequestration of the jury was in fact made to the jury, which hastened its verdict; the record only shows that the jury was deliberating while the court and the parties held the above-cited conference and, for whatever reasons, the jury coincidentally requested 10 to 15 more minutes to deliberate immediately following the conference which was outside its presence.

Defendant's final argument is that the trial court abused its discretion in sentencing him to four years' imprisonment. The imposition of a sentence is a matter of judicial discretion and will not be disturbed absent an abuse. (*People v. Perruquet* (1977), 68 Ill. 2d 149, 368 N.E.2d 882.) Here, defendant contends that mitigating factors outweighed a sole aggravating factor relative to the imposition of his sentence. Specifically, defendant points to the fact that prior to the burglary for which he was convicted he had no other convictions, no serious harm was caused or threatened, he had a steady record of employment, he supports his wife and four children, and two of his children have an illness requiring occasional hospitalization throughout the year. Defendant further points out that the only factor in aggravation is the fact that he was employed as a Chicago police officer when the burglary occurred. Defendant also asserts that the trial court erred in considering an additional factor in aggravation—the value of the proceeds taken during the burglary.

The State contends that the trial court did not abuse its discretion in sentencing defendant in light of the fact that defendant had violated his public trust as a police officer, the burglary was well planned and organized, and a more severe sentence was necessary to deter others from committing the same offense. Lastly, the State asserts that the trial court properly considered the value of the proceeds taken in the burglary as a factor in aggravation and argues that defendant has failed to cite to authority holding otherwise.

Contrary to the State's final contention, defendant cited to

authority in support of his contention that the court improperly considered the value of the proceeds taken from the burglary—*People v. Conover* (1981), 84 Ill. 2d 400, 419 N.E.2d 906. In fact, in *Conover* this was the sole question before our supreme court. In holding that proceeds taken from a burglary or theft may not be considered as an aggravating factor in sentencing a defendant, the court stated:

> "The legislature has established the range of penalties to be imposed in burglary [citation] and in theft [citation] ***. Inasmuch as most burglaries and every theft involve proceeds, it is reasonable to conclude that the legislature already considered that factor in establishing the penalties. If the General Assembly had intended that proceeds be utilized again to impose a more severe penalty for those offenses, such intent would be more clearly expressed. Consequently, we believe receiving compensation for committing the offense under the statute applies only to a defendant who receives remuneration, other than proceeds from the offense itself, to commit a crime. ***
> We hold that section 5—5—3.2(a)(2) of the Unified Code of Corrections may be considered as a factor in aggravation only when one is remunerated, as explained above, to commit an offense, whether the offense is burglary or theft, where proceeds may be taken, or the crime is one that does not involve proceeds, *e.g.*, aggravated battery." (84 Ill. 2d at 404-05.)

In light of the above, we must remand this case for a reconsideration of defendant's sentence inasmuch as we cannot determine how much weight the trial court accorded the improperly considered factor in aggravation of the value of the proceeds taken in the burglary.

For the reasons stated, defendant's conviction is affirmed, his sentence is reversed and vacated, and the cause is remanded to the circuit court of Cook County for a new sentencing hearing.

*Affirmed in part; reversed in part; sentence vacated and cause remanded.*

LORENZ and COCCIA, JJ., concur.