THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JAMES H. DAVIS, Defendant-Appellant.

Second District   No. 2—89—1302

Opinion filed January 9, 1992.

G. Joseph Weller and Ingrid L. Moller, both of State Appellate Defender's Office, of Elgin, for appellant.

Gary V. Johnson, State's Attorney, of Geneva (William L. Browers and Lawrence M. Bauer, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE INGLIS delivered the opinion of the court:

Defendant, James H. Davis, appeals his conviction after a jury trial on two counts of criminal sexual assault (Ill. Rev. Stat. 1987, ch. 38, pars. 12—13(a)(1), (a)(2)) and three counts of aggravated criminal sexual abuse (Ill. Rev. Stat. 1987, ch. 38, pars. 12—16(c)(1)(ii), (d)). Concurrent sentences of four years' imprisonment for criminal sexual

assault and three years' imprisonment for aggravated criminal sexual abuse were imposed. On appeal, defendant contends that (1) the State failed to prove guilt beyond a reasonable doubt, (2) the complainant was improperly found competent to testify, (3) the trial court erred in not granting a mistrial for the violation of a motion *in limine*, and (4) the State's expert witness was improperly qualified to testify. We affirm.

On December 27, 1988, defendant was indicted on eight counts of aggravated criminal sexual abuse and four counts of criminal sexual assault. Count I was criminal sexual assault (CSA), penis to vagina and no consent. Count II was CSA, mouth to vagina and no consent. Count III was CSA, penis to vagina by force. Count IV was CSA, mouth to vagina by force. Count V was aggravated criminal sexual abuse (ACSA), penis to vagina with person at least 13 years old, but under 17 years old and defendant at least five years older than complainant (age). Count VI was ACSA, mouth to vagina and age. Count VII was ACSA, touching vagina and age. Count VIII was ACSA, touching breasts and age. Count IX was ACSA, mouth to breast and age. Count X was ACSA, touching vagina by force. Count XI was ACSA, touching breasts by force. Count XII was ACSA, mouth to breast by force. All counts alleged sexual conduct with D.S., the 17-year-old daughter of defendant's girlfriend, M.S. D.S. suffers from Down's syndrome and has the mental capacity of a five-year-old child.

Before trial, a competency hearing was conducted to determine D.S.'s ability to testify. The court found D.S. competent, but recognized that cross-examination would be difficult. Also before trial, the trial court granted defendant's motion *in limine* barring any testimony, likely to be elicited from M.S., concerning previous allegations of sexual misconduct by defendant in March 1988. The court stated it would allow this testimony only on rebuttal.

The State's first witness was Dr. Martin Dunsky, an emergency room physician at Copley Hospital, where D.S. was taken after the alleged incident. Dr. Dunsky testified that on October 15, 1988, at approximately 3:40 p.m., he collected specimens to complete a sexual assault kit, but was unable to perform an internal vaginal exam due to D.S.'s uncooperativeness. Dr. Dunsky asked D.S. why she was at the hospital, and she replied that defendant had kissed and licked her vagina. It was unclear from D.S.'s answers whether D.S. and defendant had intercourse or even whether D.S. was forced to perform oral sex on defendant. Dr. Dunsky testified that D.S. was calm during the interview and examination, except when a vaginal exam was attempted. He saw no signs of physical abuse on D.S. Dr. Dunsky did not exam-

ine M.S. and testified he had no occasion to determine whether M.S. had been physically abused.

D.S. was the next person to testify, with assistance from an interpreter. After she stated her name, age, brother's name and apartment number correctly, D.S. identified defendant as the person who took off her clothes. D.S. testified that Davis had kissed her on the lips, buttocks, breasts and vagina. Using anatomically correct dolls, D.S. showed how defendant allegedly took his and her clothes off, placed his penis in her vagina, kissed her breasts, licked and kissed her vagina and had D.S. perform oral sex.

On cross-examination, D.S. testified how defendant allegedly choked her, hit her on the arm and threatened her with a knife. At this point in the cross-examination, D.S.'s testimony became incoherent. It is unclear whether D.S. was recalling events that had happened to her or her mother and whether they occurred on the day in question or in the past. When D.S. regained her composure, she stated the name of the school she attended, her teacher, the names of her friends and the name of the defense attorney, whom she had previously met. On redirect examination, D.S. identified the judge and explained what she did at school. D.S. testified that defendant held down her arms and choked her. Again, it was unclear whether she was recalling the day of the alleged incident or another day in which D.S. saw defendant do this to her mother. But, D.S. reiterated that defendant kissed her vagina. On re-cross-examination, D.S. testified that her mother fought with defendant.

Milton S., the complainant's brother, was the next witness. Milton testified that on the day in question he lived with his mother, sister, and defendant. Milton was alone in the home with D.S. when defendant arrived home at approximately 2 p.m. Defendant told Milton he could go outside but to be back by 7 p.m. Milton returned at approximately 6:30 p.m., but no one was home.

The next witness for the State was D.S.'s mother, M.S. M.S. testified that she moved to Aurora to marry defendant, but did not marry him because "something wasn't right." She continued to live with him though. She lived with defendant off and on for six years. According to M.S., defendant stopped living with her and the family in March 1988, but returned in July. M.S. stated that D.S. suffers from Down's syndrome. M.S. testified that she had no conversations with D.S. about sex, until March 1988 when D.S. told M.S. about "something that happened to her that someone had did [sic] to her."

Turning to the events of October 15, 1988, M.S. testified that she was at work that afternoon. Defendant called her at work sometime

after 1 p.m. but spoke to her supervisor. At approximately 1:30 p.m., after M.S. made several mistakes at work, the supervisor told M.S. to go home. According to M.S., she took the bus to the Salvation Army, where defendant worked, to see if he was there. After discovering that he was not there, M.S. took the bus home. When she got home, she entered the apartment through the locked back door. M.S. testified that she walked into the living room and found defendant lying on the floor on top of D.S. M.S. could see defendant was wearing a light-colored shirt and that his buttocks were naked. M.S. pulled defendant off her daughter and told D.S. to put on her pants and another blouse from the clothes lying on the couch. M.S. also testified that the blouse D.S. was wearing was torn and and that M.S. threw it away. M.S. stated that she then attempted to call the police, but defendant tried to choke her with the telephone cord. M.S. pushed defendant away, and he ran into the kitchen and came out with a knife in his hand. According to M.S., she grabbed D.S. and ran out the front door to the apartment of their neighbor, Betty Yankaway.

M.S. testified that she called the police from Betty Yankaway's apartment. M.S. says she told Betty that defendant raped D.S. When the police arrived, they spoke to D.S. M.S. said that she was too upset to speak with the police. Later, the police took D.S. and M.S. to the hospital. According to M.S., D.S. became more introverted, had nightmares, and gained weight after the incident.

Anthony Pekich, the Aurora police officer who answered the call on October 15, 1988, testified that he spoke with defendant and D.S. when he arrived. D.S. seemed nervous, fidgety and excited, but not hysterical. There was no sign of physical injury. According to Officer Pekich, M.S. also showed no signs of physical injury. M.S. told him that D.S. had her pants down and was on the couch. Defendant was on his knees with his face between D.S.'s legs. M.S. also told Officer Pekich that when she first walked into the apartment she heard defendant tell D.S. not to say anything. M.S. did not mention the torn blouse, that defendant allegedly chased M.S. holding a knife or that defendant allegedly tried to choke her with the phone cord. Officer Pekich testified that he subsequently took M.S. and D.S. to Copley Hospital to have a sexual assault kit completed. He returned to the hospital a few hours later to pick up the kit and brought it to the police station.

The final witness for the State was Linda Healey, the director of a sexual assault program at Mutual Ground in Aurora. Ms. Healey testified that she has been director of the program for two years and three months. She supervises three therapists and education special-

ists. She is the primary counselor and support group moderator for rape victims. Mutual Ground also provides shelter for battered women and their families. Prior to her directorship, Ms. Healey spent two years as a child assault prevention (CAP) specialist with Family Support Center in Aurora. She was trained and certified as a CAP specialist. The training program was four days long. Before that, Ms. Healey taught elementary school for 10 years. She has a BS in education from Illinois State University and is a graduate student at the Jane Addams College of Social Work, University of Chicago. Ms. Healey also testified that she has had specialized training courses to help rape victims and their families throughout the medical and legal process. She has personally seen 80 rape victims in the previous two years, ranging from the age of 3 to 89. Ms. Healey testified that she is familiar with rape trauma syndrome, which is recognized by the American Psychological Association as a traumatic stress disorder. There are no degree courses on rape trauma syndrome.

On cross-examination pertaining to Ms. Healey's qualifications to testify as an expert witness, she testified that she has not received formal medical training and is not a clinically registered psychologist. As such, Ms. Healey is not allowed to give a clinical diagnosis. She has never before been qualified in any court as an expert witness. Ms. Healey was deemed to qualify as an expert witness, over the objection of defense counsel.

After qualifying as an expert witness, Ms. Healey testified about the five different stages of post-traumatic stress disorder, explaining that not every individual goes through every stage. Turning to the instant situation, Ms. Healey stated that she met D.S. on October 18, 1988, when D.S. and M.S. were residents at the shelter. D.S. stayed at the shelter for approximately seven days, and Ms. Healey saw her each day. According to Ms. Healey, D.S. exhibited several symptoms of someone affected by rape trauma syndrome. These symptoms included nightmares, unusual anger, mood swings, stomachaches when talking about the alleged incident and an eating disorder. D.S. had gained 35 pounds since the alleged incident. Ms. Healey testified that her opinion, based on a reasonable degree of scientific certainty, was that D.S.'s symptoms were consistent with rape trauma syndrome. She based this opinion on her own observations, those of the other counselors at the shelter and the information provided by M.S.

On cross-examination, Ms. Healey testified that she does not directly counsel children at the shelter. Her background in counseling children was limited to the area of sexual assault. She agreed that it was possible for children to exhibit symptoms similar to those of rape

trauma syndrome without being sexually abused. After redirect examination of Ms. Healey, the State rested its case.

Defendant's first witness was Laura Harrison, the nurse from Copley Hospital who helped prepare the sexual assault kit. Nurse Harrison recalled the day when D.S. and M.S. came to the emergency room. D.S. was a little anxious and tearful when she arrived. Nurse Harrison had difficulty interviewing D.S., so M.S. acted as interpreter. According to Nurse Harrison, M.S. stated that she found defendant kneeling in front of D.S., who was on the couch with her underwear down. D.S. told M.S. that he was sucking her breasts and kissing her between the legs. Defendant was wearing undershorts and a shirt. Nurse Harrison saw no signs of physical injury on D.S. Nurse Harrison did not recall M.S. stating that she saw defendant on top of D.S.

Michael Podlecki, a forensic scientist, testified that no semen or other secretions of defendant were found on any of the samples from the sexual assault kit. After Podlecki's testimony, defendant moved for a mistrial, alleging that the State had referred to previous allegations of sexual misconduct in violation of the motion *in limine.* The motion was denied, but the court instructed defense counsel to raise it again in his post-trial motion. Defense counsel also moved for directed verdicts, which were granted as to counts VII, VIII, X and XI, all charging the defendant with aggravated criminal sexual abuse.

The next witness for the defense was Betty Yankaway, the complainant's neighbor. Betty testified that on October 15, M.S. came to Betty's apartment and asked her to call the police. Betty was in the basement and told M.S. to call the police herself. When Betty came upstairs, she saw M.S. and D.S. According to Betty, D.S. did not appear upset, but M.S. was upset. M.S. told Betty that defendant had wrapped the phone cord around M.S.'s neck and that he had a knife. M.S. also said that defendant had molested D.S. Betty testified that she saw no evidence of physical abuse on either M.S. or D.S. D.S. was not wearing a torn blouse. The police arrived approximately 5 to 10 minutes later. Betty interpreted D.S.'s statement for the police officer.

Peggy Everling, an investigator with the Department of Children and Family Services (DCFS), was the next witness. Ms. Everling testified that she took a hot-line call at approximately 6 p.m. on October 15, 1988, about a suspected case of sexual abuse. Ms. Everling called the police officer listed on the report. She also spoke with the attending nurse at the hospital and M.S. According to Ms. Everling, M.S. told her that upon arriving home M.S. entered D.S.'s bedroom and

saw the defendant licking D.S.'s vagina. M.S. stated that both D.S. and defendant were naked. Ms. Everling described M.S. as sounding "a little overwhelmed" and "not calm." M.S. told Ms. Everling that defendant tried to beat her and that M.S. and D.S. had moved out of the apartment for a while. Ms. Everling also testified that she never visited the apartment and was unfamiliar with its layout.

Michael Bertrand, the DCFS investigator who followed up on the case, testified that he was at the State's Attorney's office on November 23, 1988, when M.S. and D.S. were interviewed. According to Mr. Bertrand, M.S. stated that D.S. was wearing only a shirt when M.S. found her on October 15. M.S. did not mention the torn blouse or that defendant allegedly threatened M.S. and D.S. with a knife. M.S. did say that defendant was naked from the waist down and was on top of D.S. D.S. was on her back with her legs spread open and she was crying. Mr. Bertrand also recalled M.S. saying that she "lost her head" when she saw defendant and "started hitting" him.

The final witness for the defense was defendant, James Davis. He testified that he first met M.S. in 1982 and had lived with her most of that time, but they never married. He described his relationship with M.S. as "bad," involving arguments over money and drugs. According to defendant, twice over the last five years M.S. left him alone with the children for a few days, once to seek drug treatment.

Defendant further testified that on October 15 he came home around 1:30 p.m. He called M.S. at work and spoke to her directly. He told M.S. that he let Milton go outside and play. M.S. told him she would be home in a few minutes. Defendant stated that he called his attorney about receiving disability payments. He dropped a piece of paper with the lawyer's phone number on the floor. He was bending down to pick up the paper when M.S. walked in and asked him what he was doing. At that time, D.S. was sitting at the other end of the couch. An argument ensued, and defendant told M.S. he wanted her and her kids to move out. Defendant stated that he called 911, but the police did not come. M.S. went next door and called the police. When the police arrived, according to defendant, he was sitting on the couch in the apartment. Defendant denied that he sexually abused D.S.

Subsequently, defendant was taken from the apartment to the Aurora police station, where he spoke to Officer Greg Anderson. Defendant testified that he was not read his *Miranda* rights before speaking to Officer Anderson. Defendant further testified that he told Officer Anderson that he was looking for some Social Security papers when M.S. walked into the apartment. The State called Officer Anderson as

a rebuttal witness, who testified that he advised defendant of his *Miranda* rights prior to questioning him at the station. Defendant read, initialed and signed the *Miranda* form.

After eight hours of deliberation, the jury returned not guilty verdicts as to counts I, III and V, the penis-to-vagina counts, and found defendant guilty on the remaining five counts. On December 8, 1989, defendant's motion for a new trial was denied. Defendant was sentenced to four years' imprisonment for the criminal sexual assault charge and a concurrent, three-year term for the aggravated criminal sexual abuse charge. The court set aside the verdicts on one count of criminal sexual assault and two counts of aggravated criminal sexual abuse. Defendant filed a timely notice of appeal.

Defendant first contends that the State failed to prove guilt beyond a reasonable doubt. On review, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (*In re A.J.H.* (1991), 210 Ill. App. 3d 65, 71.) The standard for reviewing the sufficiency of the evidence in sexual abuse cases has changed from one where the complainant's testimony must be clear and convincing to the reasonable doubt standard applied in all criminal cases. (*People v. Schott* (1991), 145 Ill. 2d 188, 202; *In re A.J.H.*, 210 Ill. App. 3d at 70-71.) It is the function of the jury to weigh the credibility of the witnesses and resolve inconsistencies in their testimony. (*People v. Eyler* (1989), 133 Ill. 2d 173, 191.) As the court stated in *People v. Fields* (1990), 199 Ill. App. 3d 888:

> "It is well established that a reviewing court will not substitute its judgment for that of the trier of fact who heard the evidence and had the opportunity to observe the witness' demeanor unless the evidence is so palpably contrary to the verdict or so unreasonable, improbable or unsatisfactory as to cause a reasonable doubt as to defendant's guilt." *Fields*, 199 Ill. App. 3d at 901.

Defendant argues that M.S.'s testimony should be discounted because of the inconsistent versions of the incident she gave to the hospital personnel, her neighbor and the DCFS investigators. M.S. testified that she walked in and saw defendant lying on the floor on top of D.S. M.S. could not see well enough to describe specifically what acts were occurring, but saw defendant's buttocks were "naked." M.S. told her neighbor that defendant "molested" D.S. M.S. told Officer Pekich that D.S. had her pants down and was on the couch while defendant was on his knees with his face between D.S.'s legs. At the

emergency room, M.S. told Nurse Harrison that defendant was kneeling in front of D.S., who was on the couch with her underwear down. Defendant, wearing undershorts and a shirt, was sucking D.S.'s breasts and kissing her between the legs. M.S. told the first DCFS investigator, Peggy Everling, that she entered D.S.'s bedroom and saw defendant licking D.S.'s vagina. According to M.S., both defendant and D.S. were "naked." Later, M.S. told the other DCFS investigator, Michael Bertrand, that defendant was naked from the waist down and was on top of D.S.

In M.S.'s testimony, there are conflicting statements about the exact positioning of defendant and D.S. The critical elements that remain consistent throughout M.S.'s testimony are that defendant was "over" D.S., both were in a state of undress and defendant was in close proximity to D.S.'s exposed body. M.S. did not tell any of the witnesses that she saw defendant having "intercourse" with D.S. As such, the jury found defendant not guilty as to the penis-to-vagina counts, despite the testimony of D.S.

Defendant also argues that D.S.'s testimony was unreliable. D.S. testified that defendant kissed her on the lips, buttocks, breasts and vagina. She also stated that defendant placed his penis in her vagina and her mouth, demonstrating with anatomically correct dolls. Dr. Dunsky, the emergency room doctor, corroborated part of this testimony when he testified that D.S. told him that defendant kissed and licked her vagina. But, there were moments in D.S.'s testimony when she was confused by the questions asked. She gave conflicting accounts about the specific acts performed by defendant. Notwithstanding her inconsistent testimony, she remained clear concerning the identity of defendant, the fact that she was undressed and that defendant was in some way sexually abusive. What specific sexual acts were performed was a question of fact for the jury to decide based on the testimony of D.S., M.S. and the corroborating witnesses. There was enough evidence provided by the witnesses for the jury to determine that sexual abuse occurred.

Defendant relies on *People v. Findlay* (1988), 177 Ill. App. 3d 903. There, the defendant was charged with five counts of aggravated criminal sexual abuse. The five counts alleged five separate occurrences of sexual misconduct. Two counts were nol-prossed by the State. At trial, significant impeachment evidence was presented on the other three counts. The court found the defendant guilty on only one count. On review, this court held that the "pervasiveness of the impeachment" supported the conclusion that the complainant's testimony failed to meet the then "clear and convincing standard." There

was substantial evidence by two other witnesses that the alleged sexual abuse detailed in count III did not occur.

We find the *Findlay* case distinguishable from the instant case. First, as we noted earlier, the standard of review for sexual abuse cases has changed significantly since that decision. Notwithstanding that change, the defendant's testimony in *Findlay* was substantially corroborated by two witnesses who were sleeping only a few feet from the room in which the incident allegedly occurred. They testified that they heard no noises coming from the room. Moreover, one of the witnesses was awake at the exact time the incident allegedly occurred.

Here, defendant provides no independent corroboration of his story, as the defendant in *Findlay* did. Instead, defendant argues that since the jury believed the impeachment evidence as to penis-to-vagina contact and rendered not guilty verdicts on those counts, the "pervasiveness of the impeachment" called for not guilty verdicts on the mouth-to-breast and mouth-to-vagina counts. In *Findlay*, there was doubt whether an entirely separate incident of abuse occurred based on strong evidence by third-party witnesses. Here, there was no independent evidence that nothing happened. Absent the testimony of defendant, the evidence pointed to the fact that something happened. The jury was there to weigh the credibility of the witnesses and determine what happened. We hold that there was sufficient evidence for the jury to find defendant guilty on the mouth-to-breast and mouth-to-vagina counts.

Defendant's second contention is that the trial court abused its discretion in finding D.S. competent to testify. A determination of competency by the trial judge should not be set aside absent an abuse of discretion or when based on a manifest misapprehension of a legal principle. *People v. Lawler* (1989), 181 Ill. App. 3d 464, 468.

Defendant relies on *People v. Wolfe* (1988), 176 Ill. App. 3d 299, and *People v. Born* (1987), 156 Ill. App. 3d 584, to support his contention that D.S. was incompetent to testify. In *Wolfe*, a five-year-old child was found incompetent to testify. The child knew her age, but not her birthdate. She could not recall whether she had a party on her last birthday, but could recall the previous Christmas. She knew she lived in Illinois, but could not recall in which town she lived. She named her school, but could not say how long she had attended. She gave correct examples of telling the truth versus lying. The court affirmed the lower court's finding of incompetency without analysis, but stated the test to determine competency:

"[C]ompetency *** must be judged on whether [a child] is sufficiently mature to (1) receive correct impressions from [the] senses; (2) recollect those impressions; (3) understand questions and narrate answers intelligently; and (4) appreciate the moral duty to tell the truth." *Wolfe*, 176 Ill. App. 3d at 301.

In *Born*, another five-year-old child was found competent where she knew the name of her older brother's school, that her brother was on summer vacation, the names of her preschool teachers from the previous year, the names of other children in her class, her favorite game, the name and breed of her dog, the type of car her parents owned and the street on which her grandparents lived. She also understood the difference between the truth and a lie, which was determined after some contradictory responses. (*Born*, 156 Ill. App. 3d at 588.) The court held that one imperfect response concerning truthfulness would not invalidate a competency finding in light of the totality of her responses. Defendant argues that this case is distinguishable because D.S. was not asked questions as difficult and her answers were less clear.

The trial court in the case at hand found *People v. Spencer* (1983), 119 Ill. App. 3d 971, persuasive. There, the victim was a mildly to moderately retarded adult, who was unable to communicate verbally. She answered questions with the use of a board containing the alphabet, numbers, days, weeks, and the like. When questioned about the crime, she gave confusing and conflicting answers concerning time periods, what she was wearing and whether she had seen the defendant prior to the alleged rape. The defense had some difficulty cross-examining the victim because she was less attentive at the end of her testimony. *Spencer*, 119 Ill. App. 3d at 977.

The defendant in *Spencer* appealed his conviction arguing, *inter alia*, that he was denied the right to confront the witness because the victim's mental retardation and inability to communicate verbally prevented adequate cross-examination. The court stated that the defendant was implicitly attacking the witness' competency and stated:

> "We have repeatedly held that a witness suffering from mental impairment such as retardation [citation] is legally competent to testify so long as he has the capacity to observe, recollect, and communicate." (*Spencer*, 119 Ill. App. 3d at 977.)

The court further held that "confusing and conflicting" answers given by the witness "go to *** credibility, not *** competency." *Spencer*, 119 Ill. App. 3d at 977.

■ In the pretrial hearing, D.S. showed an adequate ability to observe, recollect and communicate. D.S. knew her name, her age, her

birthdate, her brother, his age, her mother, and the school she attends, but did not know how long she had been attending. She recognized the judge and repeatedly said to "tell the truth." From the record, it is evident that the trial judge thoroughly analyzed the case law presented to him and carefully distinguished other cases before relying on *Spencer*. We hold the trial judge's reliance on *Spencer* and his ruling of competency were not an abuse of discretion.

Defendant invokes *People v. Epps* (1986), 143 Ill. App. 3d 636, 640, for the proposition that the competency issue is determined not only by the pretrial hearing, but the trial testimony as well. At trial, D.S. repeated many of the same answers to foundational questions asked of her to determine competency in the pretrial hearing. D.S. did indeed give conflicting and confusing testimony, primarily concerning what defendant had done to her on the day in question as opposed to what he had done to D.S. in the past or what D.S. had seen defendant do to her mother. We find that whatever discrepancies occurred reflect solely on her credibility.

Defendant's third contention is that the trial court erred in denying his motion for a mistrial based on the alleged violation of his motion *in limine*. He claims the State violated the motion by presenting evidence linking him to previous allegations of sexual misconduct in March 1988. The decision by the trial judge to declare a mistrial is not subject to reversal absent an abuse of discretion. (*People v. Wills* (1987), 153 Ill. App. 3d 328, 339.) On appeal, the defendant must show that the prejudicial effect on the jury resulting from the violation of the motion *in limine* was so great as to constitute reversible error. *Skelton v. Chicago Transit Authority* (1991), 214 Ill. App. 3d 554, 583.

Defendant relies on the case of *People v. Sorice* (1989), 182 Ill. App. 3d 949, as analogous to this situation. There, the court barred the State from introducing any evidence pertaining to defendant's alleged involvement in the attempted burglary of a currency exchange. On direct examination, the State elicited testimony from an individual, allegedly involved in defendant's illegal activities, that the defendant "mentioned something about a screw-up with a currency exchange." (*Sorice*, 182 Ill. App. 3d at 957.) The court held that a new trial was not required, but would have been if it was a close case on the issue of guilt. *Sorice*, 182 Ill. App. 3d at 957-58.

Defendant argues that this is a close case on the issue of guilt, so the motion for mistrial should have been granted. But, defendant fails to show how this reference prejudiced the jury. In *Sorice*, the witness explicitly stated that it was the defendant who

made that statement. Also, the currency exchange was mentioned. Here, defendant's name was not associated with the March 1988 incident when D.S. told M.S. about a sexual situation she had experienced. Also, the situation was not couched as one of sexual misconduct, only that "something that happened to her that someone had did [*sic*] to her." The prejudicial effect of this statement is at best speculative. Thus, the trial judge did not abuse his discretion in denying the motion for mistrial.

Finally, defendant contends that the State's expert witness, Linda Healey, was improperly qualified to testify. An expert is a person who, because of special training or experience, possesses knowledge greater than that of an average person on a particular subject. (*Mobil Oil Corp. v. City of Rolling Meadows* (1991), 214 Ill. App. 3d 718, 727.) Absent an abuse of discretion, the trial court's determination that an expert is qualified to give an opinion will not be overturned. (*People v. Free* (1983), 94 Ill. 2d 378, 410.) The credibility and weight of an expert's testimony are matters to be decided by the trier of fact. *Elliott v. Koch* (1990), 200 Ill. App. 3d 1, 12.

Defendant acknowledged that Illinois recognizes expert testimony about rape trauma syndrome (see Ill. Rev. Stat. 1989, ch. 38, par. 115—7.2), but attempts to persuade this court that Ms. Healey was unqualified to testify in this instance because of her unfamiliarity with Down's syndrome individuals. As a preliminary matter, defendant cites in his brief a number of scientific articles pertaining to the behavioral characteristics of Down's syndrome individuals. Notwithstanding our June 25, 1991, denial of a motion to strike appendix B of the defendant's brief, this court will not acknowledge the appendix. Attachments to a brief which are not part of the record on appeal are not properly before the reviewing court. *People v. Lutz* (1982), 103 Ill. App. 3d 976, 979-80.

The director of a rape counseling center, the position held by Ms. Healey, has been found qualified as an expert in the area of rape trauma syndrome. (*People v. Douglas* (1989), 183 Ill. App. 3d 241.) In fact, the expert in *Douglas* had credentials very similar to those of Ms. Healey. The director in *Douglas* had been executive director of the center for three years. She had an undergraduate degree in liberal arts. She attended graduate school for training in counseling. She received specialized training in rape trauma counseling, including training on rape trauma syndrome. She did not have a psychology degree. *Douglas*, 183 Ill. App. 3d at 254.

Based on the *Douglas* case, we find that the trial judge did not abuse his discretion in qualifying Ms. Healey to testify about rape

trauma syndrome. The fact that she had no knowledge of the general behavioral characteristics of people suffering from Down's syndrome does not negate her qualifications to testify about rape trauma syndrome. "[T]he reality that many of the [post-traumatic stress syndrome] symptoms may be caused by factors other than sexual abuse goes to the weight to be accorded such testimony and not its admissibility." (*People v. Wasson* (1991), 211 Ill. App. 3d 264, 270-71.) Nothing prevented defendant from impeaching Ms. Healey on this point or providing an expert on Down's syndrome to explain such behavior.

For the foregoing reasons, the convictions of defendant are affirmed.

Affirmed.

WOODWARD and McLAREN, JJ., concur.