THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. VIN-
CENT BRITT, Defendant-Appellant.

Fourth District   No. 4—92—0262

Argued January 19, 1994.—Opinion filed June 30, 1994.

130

COOK, J., specially concurring.

Daniel D. Yuhas and Lori L. Mosby (argued), both of State Appellate Defender's Office, of Springfield, for appellant.

Craig DeArmond, State's Attorney, of Danville (Norbert J. Goetten, Robert J. Biderman, and David E. Mannchen (argued), all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE STEIGMANN delivered the opinion of the court:

In December 1991, a jury convicted defendant, Vincent Britt, of two counts of first degree murder (Ill. Rev. Stat. 1989, ch. 38, par. 9—1(a)), and one count each of aggravated arson (Ill. Rev. Stat. 1989, ch. 38, par. 20—1.1(a)), residential burglary (Ill. Rev. Stat. 1989, ch. 38, par. 19—3(a)), attempt (robbery) (Ill. Rev. Stat. 1989, ch. 38, pars. 8—4(a), 18—1(a)), and theft of property having a value in excess of $300 (felony theft) (Ill. Rev. Stat. 1989, ch. 38, par. 16—1(b)(4)). The trial court imposed a sentence of natural life in prison for the murders, and extended-term sentences of 60 years for aggravated arson, 30 years for residential burglary, and 10 years each for attempt (robbery) and felony theft. The court ordered the 60-year sentence for aggravated arson to run consecutively to the murder sentence and all other sentences to run concurrently.

Defendant appeals, arguing that (1) his constitutional rights were violated by the State's exercise of peremptory challenges in a racially discriminatory manner; (2) the jury returned legally inconsistent guilty verdicts of both first degree murder and involuntary manslaughter; (3) the trial court erred in sustaining an objection during his cross-examination of the codefendant's testimony; (4) a witness' reference to a polygraph examination denied him a fair trial; (5) the trial court erred by entering a conviction for aggravated arson based upon the same conduct supporting the first degree murder convictions; and (6) the trial court erred in sentencing him to an extended term for offenses other than first degree murder.

We disagree with each of defendant's arguments and affirm his convictions and sentences.

## I. BACKGROUND

Defendant does not challenge the sufficiency of the evidence supporting his convictions. Accordingly, we review the evidence presented at trial only to the extent necessary to place the issues in this appeal in their appropriate context. During the late evening hours of September 22 or early morning hours of September 23, 1990, defendant and Brian Brandon went to the home of the victims, Warren and Delores Johnson, both of whom were over 60 years of age. Defendant and Brandon had earlier discussed stealing aluminum cans or copper wiring from the Johnson residence, but once there decided instead to ask to borrow some money. While Brandon waited outside,

defendant knocked on the door, and Mr. Johnson let him in. About a half hour later, defendant rejoined Brandon outside, telling him that "he did what he had to do," which Brandon interpreted to mean defendant beat up Mr. Johnson.

At that point, defendant and Brandon both entered the house. Mrs. Johnson, who was physically handicapped and could not walk without assistance, was in bed. Defendant and Brandon asked Mr. Johnson for money, who responded that he did not have any. Defendant stated that he did not believe him and threatened to set Mrs. Johnson on fire unless Mr. Johnson complied. Defendant then pushed Mr. Johnson aside and went into the bedroom. After Mr. Johnson again denied having any money, defendant set Mrs. Johnson's nightgown on fire. Defendant and Mr. Johnson began to fight, and Brandon left the Johnson residence and ran away. Defendant eventually knocked Mr. Johnson unconscious by a blow to his head. Defendant then brought several old tires from the back porch into the kitchen and moved the refrigerator against the door, leaving a small space through which he could escape while blocking in the physically larger Johnsons. Defendant ignited the tires in the kitchen and left the residence.

In the early morning hours of September 23, a passerby noticed the Johnson house on fire and called the authorities. Both Mr. and Mrs. Johnson died from fire and smoke inhalation. Mrs. Johnson most likely died from the fire lit in the kitchen that consumed the house, rather than from the fire lit on her torso.

At some point between September 23 and October 12, 1990, defendant returned to the Johnson residence and stole a lawnmower.

On October 31, 1990, approximately 6,700 feet of insulated copper wire, weighing nearly 130 pounds, was stolen from CSX Transportation. The police followed drag marks to the home of defendant's relatives. Later, the police interviewed Brandon regarding the theft of the copper wire and the earlier fire at the Johnson residence, ultimately leading to defendant's arrest for both offenses.

As part of an agreement with the State, Brandon pleaded guilty to aggravated arson, residential burglary, and attempt (robbery) in exchange for the State's agreement that his sentence would not exceed 30 years. Brandon testified against defendant at defendant's trial as part of this agreement.

## II. ANALYSIS

### A. *The Batson Challenge*

●1 Defendant argues that the State violated his rights under the

equal protection clause of the fourteenth amendment of the United States Constitution by using its peremptory challenges to exclude blacks from the jury. In *Batson v. Kentucky* (1986), 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712, the United States Supreme Court held that the State may not use its peremptory challenges to strike prospective jurors solely on the basis of their race. *Batson* established a three-step analysis to determine whether a particular peremptory challenge was proper. First, the defendant must establish a *prima facie* case of purposeful discrimination in the State's use of the peremptory challenge. (*Batson*, 476 U.S. at 96, 90 L. Ed. 2d at 87, 106 S. Ct. at 1723.) If the defendant establishes the *prima facie* showing, the burden shifts to the State to provide a "clear and reasonably specific" race-neutral explanation for each challenge in question. (*Batson*, 476 U.S. at 97-98 n.20, 90 L. Ed. 2d at 88-89 n.20, 106 S. Ct. at 1723-24 n.20.) Defense counsel may then rebut the prosecutor's reasons as being pretextual. *People v. Mitchell* (1992), 152 Ill. 2d 274, 288, 604 N.E.2d 877, 885.

The State's reason for exercising a peremptory challenge must be race-neutral. The State must demonstrate to the trial court that the stricken prospective juror exhibited a "specific bias" related to the particular cause to be tried other than being the same race as the defendant. (*People v. Andrews* (1993), 155 Ill. 2d 286, 293, 614 N.E.2d 1184, 1189.) In other words, the State's peremptory challenge must be "based on something other than the race of the venireperson." *People v. Hudson* (1993), 157 Ill. 2d 401, 428, 626 N.E.2d 161, 172.

In this case, the trial court found that defendant successfully established the *prima facie* showing. At that point, the burden shifted to the State to offer a legitimate, race-neutral reason for each of its contested peremptory challenges. After considering the State's explanation and defendant's response, the trial court rejected defendant's claim and found that the State's use of each peremptory challenge was legitimate.

Once the State offers a race-neutral explanation and the trial court rules on the ultimate issue of intentional discrimination, the preliminary question of whether defendant established a *prima facie* showing becomes moot. (*People v. Smith* (1992), 236 Ill. App. 3d 812, 814, 602 N.E.2d 946, 949; *Hernandez v. New York* (1991), 500 U.S. 352, 354, 114 L. Ed. 2d 395, 405, 111 S. Ct. 1859, 1866.) Thus, we need only address the legitimacy of the State's proffered explanations.

The exclusion of even one prospective juror on account of race is unconstitutional and requires reversal of a defendant's conviction. (*Andrews*, 155 Ill. 2d at 294, 614 N.E.2d at 1189.) We must therefore examine the State's explanations for excluding each prospective juror

against whom it exercised a peremptory challenge. Initially, we note that the State offered at least three, and in most cases four, reasons for its peremptory challenges against each prospective juror at issue here. None of these explanations referred to the individual's race. If a single explanation offered by the State is acceptable, the State's use of the peremptory challenge is legitimate. *Andrews*, 155 Ill. 2d at 294, 614 N.E.2d at 1189 ("[r]esolution of the issue now before us, however, requires only that we accept one of the explanations advanced by the State with respect to each venire member").

Defendant notes that only 4 of the 78 members of the total venire were black, and all four were ultimately excused. However, two of those individuals were excused for cause. *Batson* and its progeny were only intended to prevent the racially discriminatory use of *peremptory* challenges. Therefore, prospective jurors excused by the court for cause are entirely irrelevant to a *Batson* analysis, and we examine the circumstances of only those prospective jurors excused as a result of the State's peremptory challenges. In the same vein, we add that the number of blacks in the original venire is similarly irrelevant to a *Batson* analysis. Before this court, defendant has repeatedly emphasized that only 4 of the 78 members of the venire were black, but our analysis is the same regardless of whether the number is 14 of 78 or 4 of 78.

The initial determination of the legitimacy of the State's proffered explanation for a peremptory challenge rests with the trial court, and this court will defer to that court's *Batson* findings. However, we have observed that some courts have employed a "clearly erroneous" standard (*Hudson*, 157 Ill. 2d at 428, 626 N.E.2d at 172; *Andrews*, 155 Ill. 2d at 293-94, 614 N.E.2d at 1189), while others have used the "against the manifest weight of the evidence" test (*Mitchell*, 152 Ill. 2d at 289, 604 N.E.2d at 886; *Smith*, 236 Ill. App. 3d at 815, 602 N.E.2d at 949-50). Surprisingly, this distinction has so far gone unnoticed.

In *Hernandez*, the United States Supreme Court discussed the nature of the trial court's findings in a *Batson* hearing as follows:

> "In the typical peremptory challenge inquiry, the decisive question will be whether counsel's race-neutral explanation for a peremptory challenge should be believed. There will seldom be much evidence bearing on that issue, and the best evidence often will be the demeanor of the attorney who exercises the challenge. As with the state of mind of a juror, evaluation of the prosecutor's state of mind based on demeanor and credibility lies 'peculiarly within a trial judge's province.' *Wainwright v. Witt*, 469 U.S. 412, 428, [105 S. Ct. 844, 854, 83 L. Ed. 2d 841] (1985), citing *Patton v.*

*Yount*, 467 U.S. 1025, 1038, [104 S. Ct. 2885, 2892, 81 L. Ed. 2d 847] (1984)." *Hernandez*, 500 U.S. at 365, 114 L. Ed. 2d at 409, 111 S. Ct. at 1869.

In *Mitchell*, the Supreme Court of Illinois stated that the appropriate standard of review of a trial court's *Batson* findings is whether they are "against the manifest weight of the evidence." (*Mitchell*, 152 Ill. 2d at 288-89, 604 N.E.2d at 886.) The court deemed this the correct standard because "[t]he trial court's [*Batson*] determination is a matter of fact, involving an evaluation of credibility." (*Mitchell*, 152 Ill. 2d at 288, 604 N.E.2d at 886.) Accordingly, the court employed the typical standard for reviewing a determination of a factual issue: was the ruling against the manifest weight of the evidence?

In *Hudson*, however, the court also discussed the standard of review and stated that "[b]ecause the trial judge's finding constitutes a credibility determination, it should be given great deference [citation] and will not be overturned unless it is clearly erroneous [citation]." (*Hudson*, 157 Ill. 2d at 428, 626 N.E.2d at 172.) *Hudson* thus used the same analysis to articulate "clearly erroneous" as the correct standard of review.

We conclude that "clearly erroneous" and "manifestly against the weight of the evidence" are equally deferential. "Clearly erroneous" simply describes the degree of error the trial court's ruling must reach before it constitutes a ruling "against the manifest weight of the evidence." (See *Hernandez*, 500 U.S. at 369, 114 L. Ed. 2d at 412, 111 S. Ct. at 1871-72, quoting *Anderson v. Bessemer City* (1985), 470 U.S. 564, 574, 84 L. Ed. 2d 518, 528, 105 S. Ct. 1504, 1511 (" '[w]here there are two permissible views of the evidence, the fact-finder's choice between them cannot be *clearly erroneous*' " (emphasis added)).) As such, "against the manifest weight of the evidence" is the standard of review, and "clearly erroneous" describes the necessary appellate evaluation of the trial court's findings in order to reverse. We also note that this court recently endorsed "against the manifest weight of the evidence" as the appropriate standard. *Smith*, 236 Ill. App. 3d at 815, 602 N.E.2d at 949-50.

### 1. Prospective Juror Delia White

Defendant claims that the State used a peremptory challenge against prospective juror Delia White, a black female, because of her race. At the *Batson* hearing, the State offered the following reasons for this peremptory challenge: (1) White previously served on a criminal jury which returned a not guilty verdict; (2) her cousin was a convicted murderer serving a life sentence; (3) one of the State's

potential witnesses, a multiple felon, had dated her daughter; and (4) she hesitated when responding to questions regarding the use of co-defendant testimony. Each of these reasons constitutes a legitimate, race-neutral reason to exclude a potential juror. See *People v. Walker* (1989), 191 Ill. App. 3d 382, 385, 547 N.E.2d 1036, 1037 (State's peremptory challenge of prospective juror found race-neutral where juror had served on prior "not guilty" jury and where juror's relative was convicted of theft); *Andrews*, 155 Ill. 2d at 303, 614 N.E.2d at 1193 (peremptory challenge based upon prospective juror's hesitancy in answering questions is proper and race-neutral).

Defendant, however, argues that the State's explanations are pretextual because it failed to strike other prospective jurors with similar characteristics. Defendant notes that the State accepted the following members of the venire: (1) Carroll Darrow, a white male, who previously served on both a civil and criminal jury, each of which returned verdicts of not guilty; (2) Jack Tate, a white male, whose father-in-law participated in a murder-suicide; and (3) Ronald Johnson, a white male, who was convicted of misdemeanor possession of marijuana in 1987, and who was solicited to commit murder for hire (although he did not commit the offense). Defendant also attempts to explain White's hesitancy in answering questions during *voir dire* as being due to her age.

However, the Supreme Court of Illinois recently reaffirmed that "the mere fact that the State challenges a black venireperson for a reason which is equally applicable to a white juror does not show in and of itself that the offered explanation is pretextual." (*Hudson*, 157 Ill. 2d at 431, 626 N.E.2d at 173.) The court explained as follows:

> " '[I]n many instances there will be no single criterion that serves as the basis for the decision whether to excuse a particular venireman. A characteristic deemed to be unfavorable in one prospective juror, and hence grounds for a peremptory challenge, may, in a second prospective juror, be outweighed by other, favorable characteristics.' (*People v. Mack* (1989), 128 Ill. 2d 231, 239.)
> Consequently, a peremptory challenge may be based on a combination of traits. A particular trait that justifies exclusion of a venireperson can be acceptable in a juror who has a different combination of traits which distinguish that juror from those peremptorily challenged." *Hudson*, 157 Ill. 2d at 431, 626 N.E.2d at 173.

Prospective juror White is easily distinguishable from each of the other prospective jurors cited by defendant. Darrow served in the military during World War II and Korea, earned a master's degree,

and had been the mayor of Potomac. His cousin, with whom he had a close relationship, was a judge in Montana. Darrow knew volunteer firemen, was the victim of a fire himself, and knew none of the witnesses in this case. Finally, Darrow indicated that he considered the death penalty to be a fair punishment. In contrast, White had no military experience, only two years' college education, knew several of the witnesses involved in the case, and expressed no opinion regarding the death penalty.

White is also distinguishable from Tate who, unlike White, had served on a jury which returned a guilty verdict. Further, the State excused two other potential jurors, both white, who had close relationships with individuals who had participated in criminal activity or had criminal records. The State's challenges to these other prospective jurors indicates that it used these criteria in a racially nondiscriminatory and consistent manner.

Johnson also exhibited several characteristics that could be deemed reasonably attractive to the prosecution. After being approached regarding a murder-for-hire scheme, Johnson notified the police and worked with the State, ultimately testifying as a prosecution witness. Also, he served in the Army for three years and National Guard for one year, receiving honorable discharges from each.

Although each of these members of the venire may have shared a particular characteristic with White, each contained other traits which the State could have reasonably considered favorable as well. Thus, we conclude that the trial court's finding that the State's peremptory challenge to White was race-neutral was not against the manifest weight of the evidence. See *Hudson*, 157 Ill. 2d at 431, 626 N.E.2d at 173.

### 2. Prospective Juror Willie Young

Defendant also claims the State used a peremptory challenge to strike prospective juror Willie Young, a black male, because of his race. The State explained that it based its peremptory challenge to Young on the following factors: (1) Young stated that he knew defendant's father, an anticipated witness in the case; (2) Young knew of defendant and his reputation; (3) Young was acquainted with several other potential witnesses; (4) the State believed that Young might be sympathetic to a young man such as defendant; and (5) the State recently prosecuted a high-profile case against an individual with the same surname. Additionally, the State explained that it interpreted Young's comments regarding defendant's father, a felon with multiple convictions, as speaking favorably of him. Each of

these reasons again constitutes a facially valid, race-neutral reason to exercise a peremptory challenge. Nonetheless, defendant claims these reasons are merely pretext because they were, in part, shared by other prospective jurors whom the State did not peremptorily excuse.

The State's concerns about Young's acquaintance with defendant's father and other potential witnesses constitute legitimate, race-neutral reasons for exercising a peremptory challenge even though these relationships did not rise to the level justifying a challenge for cause. (See *Mitchell*, 152 Ill. 2d at 291, 604 N.E.2d at 887.) Indeed, any basis for a peremptory challenge should always be less than that required to support a challenge for cause. Otherwise, *any* legitimate peremptory challenge would necessarily always constitute sufficient grounds for a challenge for cause.

Noting that the State introduced defendant's father's testimony, defendant argues that any acquaintance Young might have had with him would necessarily bolster his credibility and hence favor the State, thereby belying its argument for peremptorily challenging Young. However, the issue is not whether Young's past association with defendant's father would affect that witness' credibility in some fashion, but whether it might affect Young's independent and objective assessment of the overall case. A peremptory challenge for any reason—or no reason—is legitimate *unless* exercised in a racially discriminatory fashion. (See *Walker*, 191 Ill. App. 3d at 385-86, 547 N.E.2d at 1038.) The State's concerns about Young's association with defendant's father and other witnesses and whether that association might affect his ability to assess the State's case constitute legitimate, race-neutral reasons for peremptorily excusing him.

Defendant notes that the State accepted potential juror Terry Sherman, a white male, who knew defendant's aunt, a potential defense witness. He argues that the State's acceptance of Sherman demonstrates that its proffered reason for excusing Young based on his association with potential witnesses is mere pretext. However, Sherman is distinguishable from Young because he knew defendant's aunt only casually. Further, the State could reasonably view Sherman as possessing several desirable traits that overcame any concerns about his knowledge of defendant's aunt, including his having (1) four years' service in the Marine Corps as a combat engineer, (2) knowledge of first aid and cardiopulmonary resuscitation (CPR), and (3) relatives who had died in a fire.

Defendant also challenges the State's proffered explanation that Young would be sympathetic to a young man such as defendant. The State argued that it based this belief upon the fact that Young was

involved in both little league and pony league teams. A prospective juror's sympathy is a legitimate reason to excuse him peremptorily, especially in a case such as this, where the venire was informed of the possibility that the prosecutor might seek the death penalty. (See *Andrews*, 155 Ill. 2d at 297, 614 N.E.2d at 1191 ("[a] prosecutor, particularly in a case such as this where the death penalty was a possibility, would be concerned with whether a juror would be unduly sympathetic toward the defendant").) However, defendant counters that several other prospective jurors accepted by the State also were involved in different civic and youth organizations. He specifically notes the following members of the venire: (1) David Smith, president of a youth football league and sponsor of a high school age church group; (2) Helen Wagoner, who did charitable work for underprivileged children; (3) Ronald Johnson, a little league coach; and (4) Carroll Darrow, a retired high school and college teacher.

The State asserts that each of these potential jurors is distinguishable from Young. The State also claims that its concerns regarding Young were based not only upon Young's experience in little league and pony league, but also his responses to questioning during *voir dire* concerning conversations regarding defendant and his reputation. The State claims that this fact alone distinguishes Young from Smith, Wagoner, and Darrow. In addition, the State notes that it struck other potential jurors it considered likely to be more sympathetic to a young defendant, including (1) Kevin Freeland, a church youth director; (2) Leon Parker, involved in youth baseball; (3) Dennis Miller, a little league coach; and (4) Kelly Shelato, who did charitable work for schools and babysitting clinics. Taken as a whole, the State's consistent challenges for this reason indicate that its concern for a potential juror's sympathy toward defendant's youth was not pretextual.

Furthermore, Smith, Wagoner, and Darrow are distinguishable from Young. Unlike Young, Smith had been the victim of a crime, did not know any of the witnesses, had not served on a jury, and was related to an emergency medical technician. Wagoner, a widow, knew CPR, had not served on a jury, had a son who had been the victim of a burglary, and a daughter who was a doctor. Darrow and Johnson also possessed several distinguishing characteristics discussed above.

Defendant also challenges the State's explanation that it recently prosecuted a high-profile case against an individual with the same surname as Young. Defendant notes that because the State offered no evidence of any relationship between Young and the defendant in the other prosecution "the prosecutor went beyond giving pretextual

reasons for his exclusion and engaged in rank speculation" regarding any possible relationship. However, we have already found that the State offered sufficient race-neutral reasons for striking Young, and we need not remand for a new trial based upon any perceived insufficiency in this particular proffered reason. (See *Andrews*, 155 Ill. 2d at 294, 614 N.E.2d at 1189.) Furthermore, this court has recently held that the "possibility that this juror could have been related to other people previously prosecuted *** was a sufficiently race-neutral reason for excusing this juror." *Smith*, 236 Ill. App. 3d at 817, 602 N.E.2d at 950.

•2 In sum, although each of these other prospective jurors may have shared a particular trait with Young, each exhibited other characteristics the State found favorable. Accordingly, we conclude that the trial court's finding that the State's peremptory challenge to Young was race-neutral was not against the manifest weight of the evidence. See *Hudson*, 157 Ill. 2d at 431, 626 N.E.2d at 173.

After considering the evidence and arguments of counsel on the *Batson* issue, the trial court made the following findings:

> "[T]he Court finds in those [(White and Young)] explanations that the State has made in each of those situations a race-neutral explanation.
>
> * * *
>
> So, the Court finds that with regard to both those two [prospective] jurors that the State's explanations are clear, specific, legitimate, and non-racial. The Court finds that there is not [*sic*] pattern here of racial discrimination in the use of its peremptories and that there is no purposeful discrimination by the State."

Based upon the record, we cannot say that the trial court's determination was against the manifest weight of the evidence. *Mitchell*, 152 Ill. 2d at 289, 604 N.E.2d at 886.

### B. *Inconsistent Verdicts*

Defendant next argues that his convictions must be reversed and remanded for a new trial because the jury initially returned guilty verdicts for both first degree murder and involuntary manslaughter. We disagree.

During the instructions conference, defendant asked the trial court to instruct the jury on involuntary manslaughter as a lesser included offense of first degree murder. The court did so over the State's objection. After the jury deliberated, it returned guilty verdicts for both first degree murder and involuntary manslaughter (in addition to its findings on the other counts). The court then asked if either party wished to have the court poll the jury, and each declined. The State then announced its intention to seek the death

penalty, and the court informed the jury that "[n]ormally, after a jury returns its verdict, that ends a jury's duties. But in this particular case, and only in this particular type of case [(death penalty)], that does not occur." The court then told the jury to return to the jury room to await further matters. After the jury left the courtroom, the State pointed out the inconsistency in the verdicts.

After discussing the matter with counsel, the court recalled the jury. The court informed the jury that guilty verdicts for first degree murder and involuntary manslaughter were legally inconsistent and that it could return only one of the following three verdicts: (1) not guilty; (2) guilty of first degree murder; or (3) guilty of involuntary manslaughter. (See Illinois Pattern Jury Instructions, Criminal, No. 26.01Q (2d ed. Supp. 1989) (hereafter IPI Criminal 2d No. 26.01Q (Supp. 1989)).) After further deliberation, the jury found defendant guilty of first degree murder. The court then expressly accepted the jury's verdicts and entered judgments of conviction.

Defendant contends that the trial court erred in resubmitting the issue to the jury. He claims that the court *de facto* accepted the verdicts when it originally informed the jury that under typical circumstances its responsibilities would have been completed. He further argues that the State's election to seek the death penalty, and the court's further actions based upon that election, demonstrate the court's acceptance of the inconsistent verdicts. Defendant concludes that because the trial court accepted the verdicts, he was convicted of legally inconsistent offenses.

Defendant relies upon *People v. Almo* (1985), 108 Ill. 2d 54, 483 N.E.2d 203, to support his argument. In *Almo*, the defendant was charged with murder and armed violence, and the trial court also instructed the jury on voluntary manslaughter as a lesser included offense of murder. The jury received separate verdict forms for all three offenses, and it initially returned guilty verdicts on each. After denying the defendant's motion for mistrial, the trial court reinstructed the jury to sign either the murder or voluntary manslaughter verdict, but not both, and sent it to deliberate further. The jury then returned a guilty verdict of murder. *Almo*, 108 Ill. 2d at 62, 483 N.E.2d at 206.

On appeal, the supreme court found that the trial court acted properly. (*Almo*, 108 Ill. 2d at 64, 483 N.E.2d at 207.) After noting that guilty verdicts for both murder and voluntary manslaughter were inconsistent, the court approved the trial court's actions. The *Almo* court explained as follows:

> " 'The finding of a jury does not become a verdict until it has been received, accepted by the court and entered of record.

[Citations.]' *** When the jury has reached a verdict, the jury foreman tenders the verdict forms to the trial judge. It is then his duty to review the verdict and to determine whether it is proper in both form and substance. In this case, the trial judge received the verdicts and, upon reading them, realized that the convictions of murder and voluntary manslaughter were inconsistent.

*** [The trial judge avoided error] by sending the jury back to continue its deliberations. He had no choice. ***

*** The obvious way to correct [the jury's mistake] was for the trial judge to do precisely what he did ***. We find the court's action in this case to be both sensible and practical and clearly not an error." *Almo*, 108 Ill. 2d at 63-64, 483 N.E.2d at 207.

Defendant is correct that a conviction based upon legally inconsistent verdicts must be reversed and remanded for a new trial. (*Almo*, 108 Ill. 2d at 62, 483 N.E.2d at 206, citing *People v. Hairston* (1970), 46 Ill. 2d 348, 361, 263 N.E.2d 840, 849.) However, in our view defendant was not convicted of both first degree murder and involuntary manslaughter. Instead, we view this case as practically identical to *Almo*. Before entering judgment on the verdicts, the court sent the jury back to resolve the inconsistency in its initial findings and to choose an appropriate verdict. Once the jury did so, the court accepted the verdict—first degree murder—and entered an appropriate judgment. Only at that point was defendant "convicted."

Defendant makes much of the court's comments, the sequence of events after the jury returned the legally inconsistent verdicts, and the fact that the State was the first to notice the inconsistency. We view all of this as irrelevant. The result in this case would have been no different if the court had noticed the inconsistency itself. The court did not formally accept the verdicts or enter judgments upon them. No magic words were uttered that somehow severed the court's ability to send the jury back to resolve the inconsistency between the verdicts. For all practical purposes, the matter was still before the court, and thus still before the jury.

Legally inconsistent jury findings become reversible error only when the trial court accepts those findings and enters inconsistent convictions. Thus, although these problems are commonly referred to under the title of "inconsistent verdicts," a more accurate label would be "inconsistent judgments of conviction." Jury instructions such as IPI Criminal 2d No. 26.01Q (Supp. 1989) are specifically designed to prevent inconsistent jury findings (*i.e.*, verdicts) *before* they become convictions and hence reversible error.

A jury verdict is not final until accepted by the court. (*Almo*, 108 Ill. 2d at 63, 483 N.E.2d at 207.) "That acceptance cannot *** come in

the form of any further action consistent with the verdict, such as sentencing the defendant or ruling on post-trial motions, but must be an explicit judgment apparent of record." (*People v. Vaughn* (1981), 92 Ill. App. 3d 913, 914, 416 N.E.2d 681, 683.) In the absence of a formal judgment, no conviction exists. *People v. Cooper* (1992), 239 Ill. App. 3d 336, 356, 606 N.E.2d 705, 719.

The jury resolves factual disputes, and its verdict merely constitutes the finding of facts pertaining to the law of the case. (*Vaughn*, 92 Ill. App. 3d at 914, 416 N.E.2d at 683.) Thereafter, the trial court, not the jury, renders the final judgment. (*Vaughn*, 92 Ill. App. 3d at 914, 416 N.E.2d at 683.) The jury's verdict is not final until the court accepts it because the court must determine whether the verdict accords with the law. *Almo*, 108 Ill. 2d at 63, 483 N.E.2d at 207; *People v. Lashmett* (1984), 126 Ill. App. 3d 340, 345, 467 N.E.2d 356, 361; *Vaughn*, 92 Ill. App. 3d at 914, 416 N.E.2d at 683.

●3 Here, the jury first found defendant guilty of both first degree murder and involuntary manslaughter. Although the court considered other matters—including the State's election to seek the death penalty—it did not formally accept the jury's verdicts or enter judgment. Instead, the court offered to poll the jury and addressed the State's death penalty election. As defendant notes, these are certainly "further action[s] consistent with [accepting] the verdict." (See *Vaughn*, 92 Ill. App. 3d at 914, 416 N.E.2d at 683.) Nonetheless, these actions did not constitute formally accepting the jury's verdicts and entering judgments of conviction. Thus, the court was free to reinstruct the jury regarding the inconsistency and to seek new verdicts. In following this procedure, the court acted appropriately. See *People v. Flowers* (1990), 138 Ill. 2d 218, 231, 561 N.E.2d 674, 679 ("[T]he judge acted properly in returning the initial verdict forms to the jury. As a result, there was only one verdict entered in this case ***").

Although the trial court ultimately corrected the problem of the jury verdicts, it erred in initially instructing the jury as it did. During the instructions conference, the State tendered IPI Criminal 2d Nos. 2.01 and 26.01 (Supp. 1989), which contained the general charge against defendant and the standard concluding instructions. Defendant had no objection to these instructions. Later, defendant offered and argued for the involuntary manslaughter instruction as a lesser included offense alternative to a first degree murder verdict. After the court granted defendant's request, neither the parties nor the court raised the issue of potential problems with the previously accepted IPI Criminal 2d Nos. 2.01 or 26.01 (Supp. 1989).

Having decided to instruct on involuntary manslaughter, the

court now had to instruct the jury on first degree murder, involuntary manslaughter as a lesser included offense of first degree murder, and the host of other offenses (aggravated arson, attempt (robbery), residential burglary, and felony theft), as well. Before instructing the jury, the court stated to the parties that the Committee Note to IPI Criminal 2d No. 2.01 (Supp. 1989) "says [Instruction] 2.01 should be used whenever the jury is *not* to be instructed on a lesser included offense." (Emphasis added.) (See IPI Criminal 2d No. 2.01, Committee Note, at 10 (Supp. 1989).) During this conversation, the court and counsel acknowledged a problem with the instructions as they then stood regarding involuntary manslaughter as a lesser included offense of first degree murder. Nonetheless, the parties incorrectly referred to IPI Criminal 2d No. 2.01J (Supp. 1989) (charge against defendant—jury instructed on first and second degree murder, involuntary manslaughter, and other charges) for guidance.

The State, prophetically, opined that without an explanation of the lesser included offense relationship, the jury could return inconsistent verdicts as to first degree murder and involuntary manslaughter. However, defendant stated that he had no objection to the instruction as it stood (a modified version of IPI Criminal 2d No. 26.01 (Supp. 1989) based, in part, upon IPI Criminal 2d No. 26.01J (Supp. 1989)), and the court gave that instruction to the jury.

●4 In instructing the jury, the court stated (in its IPI Criminal 2d No. 2.01J (Supp. 1989) charge) that "defendant is charged with the offenses of first degree murder, which includes the offense of involuntary manslaughter," and then listed the other offenses. The court then recited a series of definitional and issues instructions for each offense. As part of that series, it gave the standard instructions for both first degree murder and involuntary manslaughter without any reference to the lesser included offense relationship. The court concluded by instructing the jury that it would receive both guilty and not guilty verdict forms for each offense—a total of 18 separate verdict forms. Thus, the jury received a guilty and not guilty form for both first degree murder and involuntary manslaughter, instead of the three verdict forms contemplated by IPI Criminal 2d No. 26.01R (Supp. 1989) (concluding instruction—greater and lesser offense and other charges) for use when the court instructs on involuntary manslaughter as a lesser included offense alternative to first degree murder. The court should have originally instructed the jury pursuant to IPI Criminal 2d Nos. 2.01R and 26.01R (Supp. 1989), although the court cured that error by subsequently resubmitting the inconsistent verdicts to the jury.

## C. *Limiting Defendant's Cross-examination of the Accomplice*

Defendant also claims that the trial court deprived him of his constitutional right to confront a witness by sustaining an objection during his cross-examination of Brandon, the accomplice. Specifically, defendant points to the following testimony:

"[Defense counsel]: Q. Now, when you gave your statement in Champaign on November 16th, [1990,] now the police, I mean, in that statement told you that there weren't any deals, didn't they?

A. Yes.

Q. Okay. But you were still hoping they'd let you go all the way up 'til Stark had you back at the Public Safety Building and told you that you were going be held?

[Prosecutor]: Asked and answered.

THE COURT: Overruled.

BY [Defense counsel]:

Q. I mean so you were still hoping they'd let you go all the way up until Stark told you you were going to be held on charges?

[Prosecutor]: Same objection. That specific question was asked—

[Defense counsel]: Your Honor—

[Prosecutor]: —late yesterday afternoon.

THE COURT: I understand that. Overruled.

BY [Defense counsel]:

Q. You are still hoping they'd let you go all the way up until Stark told you you were going be held on charges, weren't you?

A. Somewhat.

Q. And that hope was based on the fact that in your statement of November 16th you had described those activities of [defendant]?

[Prosecutor]: Objection as to what his characterization of what his hope may or may not be.

[Defense counsel]: He can say no if he wants to.

[Prosecutor]: That's speculation.

THE COURT: That's sustained."

A defendant possesses the right to confront witnesses against him, and the confrontation clause of the sixth amendment to the United States Constitution guarantees the right to cross-examine for the purpose of demonstrating a witness' interest, bias, or motive to testify falsely. (*People v. Harris* (1988), 123 Ill. 2d 113, 144, 526 N.E.2d 335, 348; see U.S. Const., amend. VI.) However, a defendant does not possess the unbridled authority to question a witness. "Rather, 'the Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.' (Emphasis in origi-

nal.) (*Delaware v. Fensterer* (1985), 474 U.S. 15, 20, 88 L. Ed. 2d 15, 19, 106 S. Ct. 292, 294.)" *People v. Jones* (1993), 156 Ill. 2d 225, 243-44, 620 N.E.2d 325, 332.

The scope of cross-examination rests largely within the discretion of the trial court (*Hudson*, 157 Ill. 2d at 435, 626 N.E.2d at 175), and we will not reverse absent a clear abuse of that discretion. (*People v. Kidd* (1992), 147 Ill. 2d 510, 535, 591 N.E.2d 431, 442.) Further, the trial court enjoys wide latitude in limiting the cross-examination of a witness to prevent repetitive or minimally relevant questioning, harassment, prejudice, or confusion of the issues. (*People v. Tenner* (1993), 157 Ill. 2d 341, 365, 626 N.E.2d 138, 149; *Harris*, 123 Ill. 2d at 144, 526 N.E.2d at 348.) The focus of the confrontation clause is not the limitation placed upon the cross-examination, but whether the jury was made aware of sufficient facts to determine the witness' credibility. (*People v. Collette* (1991), 217 Ill. App. 3d 465, 468, 577 N.E.2d 550, 553.) Accordingly, in analyzing defendant's claim that his cross-examination was unduly restricted, we look to the testimony *allowed* rather than that *prohibited. Collette*, 217 Ill. App. 3d at 468, 577 N.E.2d at 553.

In order to prevail on his claim, defendant must demonstrate that the trial court's ruling constituted an abuse of discretion resulting in manifest prejudice. (*Tenner*, 157 Ill. 2d at 365, 626 N.E.2d at 149; *Hudson*, 157 Ill. 2d at 435, 626 N.E.2d at 175.) Specifically, defendant claims that the trial court prevented him from questioning Brandon as to whether he made statements to the police implicating defendant in the hope that Brandon would be offered a "deal." However, we find that defendant had ample opportunity to expose— and did expose—any such bias in Brandon's testimony.

●5 Defendant effectively attacked Brandon's credibility in several ways. For example, he established that Brandon believed he was going to be charged with arson and murder at the time he gave his taped statement of November 16, 1990, and that he was nervous and scared when speaking with the police. Also, defendant extensively cross-examined Brandon regarding several of Brandon's prior inconsistent statements to the police. During this cross-examination, Brandon admitted that he had lied to the police at least twice.

Defendant also examined Brandon as to his plea agreement with the State. That agreement required Brandon to testify substantially in conformance with his statement of November 16. In exchange for his guilty pleas to aggravated arson, attempt (robbery), and residential burglary, the State agreed to dismiss the murder charges against him. During cross-examination, defendant elicited that before Brandon entered into the plea agreement, he had been worried about

possibly receiving a life sentence. Defendant also established that Brandon initially contacted the police because he believed defendant had stolen his shoes.

The record contains 140 pages of defendant's cross-examination of Brandon. On at least three separate occasions, Brandon admitted that he lied to the police and hoped that they would let him go if they believed him. Thus, the jury was fully aware that his trial testimony differed from his earlier statements to the police and that he testified pursuant to a deal with the State. The trial court did not abuse its discretion by preventing defendant from asking this single question again. *Tenner*, 157 Ill. 2d at 365, 626 N.E.2d at 149.

## D. *Reference to a Polygraph Examination*

Defendant next claims that his convictions must be reversed because Brandon referred to taking a polygraph examination during his testimony. Before Brandon testified, the trial court clearly admonished him not to make any reference to taking a polygraph examination. Also, both parties agreed not to inquire about it. During the State's redirect examination, the following exchange took place:

"Q. Who did you talk with before you gave the taped statement?

A. Just Murphy, in the polygraph, you know, Murphy."

Defendant failed to make a contemporaneous objection, and the State's examination continued without reference to the polygraph. The next morning, defendant made a motion for mistrial based upon this exchange, which the court denied.

Defendant now contends that the trial court erred in denying his motion for a mistrial. He notes that in *People v. Baynes* (1981), 88 Ill. 2d 225, 244, 430 N.E.2d 1070, 1079, the supreme court held the results of a polygraph test inadmissible. *Baynes* and its progeny found polygraph evidence too unreliable and potentially prejudicial to be admissible. See *People v. Gard* (1994), 158 Ill. 2d 191, 201, 632 N.E.2d 1026, 1031; *People v. Yarbrough* (1982), 93 Ill. 2d 421, 429-30, 444 N.E.2d 493, 496-97; *People v. Taylor* (1984), 101 Ill. 2d 377, 391-92, 462 N.E.2d 478, 485.

The decision whether to grant a mistrial rests within the sound discretion of the trial court, and this court will not reverse the trial court's decision absent an abuse of that discretion. (*People v. Davis* (1992), 223 Ill. App. 3d 580, 592, 585 N.E.2d 214, 222; *People v. Turner* (1992), 240 Ill. App. 3d 340, 353, 608 N.E.2d 141, 150.) An abuse of discretion occurs only when the trial court's decision is arbitrary, fanciful, or unreasonable. *People v. Illgen* (1991), 145 Ill. 2d 353, 364, 583 N.E.2d 515, 519.

On appeal, defendant must demonstrate that the jury was so

influenced and prejudiced by the introduction of this improper evidence that it no longer could be fair and impartial. (*Turner*, 240 Ill. App. 3d at 353, 608 N.E.2d at 150.) The determination of any potential prejudicial effect on the jury also lies within the trial court's sound discretion. (*Turner*, 240 Ill. App. 3d at 353, 608 N.E.2d at 151.) This determination rests upon the nature of the error in the context of the entire record, and "not every situation in which extraneous or unauthorized information reaches the jury results in prejudice." *Turner*, 240 Ill. App. 3d at 353, 608 N.E.2d at 151.

●6 Here, the State was attempting to rehabilitate Brandon regarding one of his statements. The State asked a question that did not refer to a polygraph or invite such an answer. Further, Brandon was earlier specifically admonished not to mention the polygraph examination, and nothing in the record indicates that the State intended such a response. (See *People v. Harp* (1990), 193 Ill. App. 3d 838, 844, 550 N.E.2d 1163, 1167.) Indeed, the record suggests that the prosecutor did not notice the comment, nor did either the court or defendant's lead counsel. Thus, the State contends that the jury may not even have heard Brandon's comment. During the hearing on the motion for mistrial, the court noted that Brandon was speaking softly at the time of this exchange. Accordingly, any prejudicial effect of this statement is at best speculative. See *Davis*, 223 Ill. App. 3d at 593, 585 N.E.2d at 223.

Furthermore, as this court recently observed:

> "Reversing the defendant's conviction, as defendant urges, would encourage future defendants to utter the words 'polygraph examination' knowing that, if convicted, they would win a mistrial or a new trial on appeal. We cannot allow such a result." (*Harp*, 193 Ill. App. 3d at 844, 550 N.E.2d at 1167.)

We now add that we similarly need not—and should not—allow a witness to possess such power and control over the course of a trial. Giving a witness the power to force a mistrial with the utterance of these words would destroy the trial court's ability to exercise its discretion in the matter. See *Gard*, 158 Ill. 2d at 208, 632 N.E.2d at 1034 (Heiple, J., dissenting).

The trial court is in the best position to assess any potential prejudice in this situation. After reviewing the circumstances of the statement at issue and hearing argument from counsel, the trial court denied defendant's motion for mistrial. We cannot say that its ruling was arbitrary, fanciful, unreasonable, or an abuse of its discretion. See *Illgen*, 145 Ill. 2d at 364, 583 N.E.2d at 519.

E. *The First Degree Murder and Aggravated Arson Convictions*

Defendant argues that his conviction for aggravated arson must be vacated because it was based upon the same conduct for which he was convicted of first degree murder. The State concedes the conviction should be vacated. Both the State and defendant are in error. See *People v. Smith* (1987), 154 Ill. App. 3d 837, 849-50, 507 N.E.2d 543, 552.

Defendant was convicted of aggravated arson based upon setting the Johnson house on fire while knowing they were inside. His first degree murder convictions were based upon intentionally causing their deaths. Defendant argues that the jury found that he killed the Johnsons by setting their house on fire while they were inside. Thus, he contends that the aggravated arson conviction was necessarily "carved out" of the same physical act as the murder convictions and therefore cannot stand.

Defendant relies upon *People v. King* (1977), 66 Ill. 2d 551, 363 N.E.2d 838, to support his argument. The court in *King* held that a defendant cannot be convicted of multiple offenses based upon a single act where some of those convictions are, by definition, lesser included in another. (See *People v. Pena* (1988), 170 Ill. App. 3d 347, 352, 524 N.E.2d 671, 675; *King*, 66 Ill. 2d at 565, 363 N.E.2d at 844 ("Multiple convictions and consecutive sentences have been permitted *** for offenses based on a single act but requiring proof of different facts" (emphasis omitted).) Thus, we must address whether aggravated arson in this case was a lesser included offense of first degree murder.

The State charged defendant with first degree murder under several theories: intentionally causing the deaths of the victims, knowingly causing the deaths of the victims, and felony murder. (See Ill. Rev. Stat. 1989, ch. 38, pars. 9—1(a)(1), (a)(2), (a)(3).) The jury returned a general verdict of guilty of first degree murder, and the court entered judgment on the most serious type of that offense— intentionally causing the deaths of the victims. (See *People v. Hosty* (1986), 146 Ill. App. 3d 876, 886, 497 N.E.2d 334, 340-41.) Thus, no judgment was entered on, and defendant does not stand convicted of, the other types of first degree murder.

●7 The elements of "intentional" first degree murder are that defendant intentionally and unlawfully caused the death of another. (Ill. Rev. Stat. 1989, ch. 38, par. 9—1(a)(1).) As charged in this case, the elements of aggravated arson are that defendant, by means of fire or explosive, knowingly damaged real property without the owner's consent, knowing that one or more persons were in the building involved. (Ill. Rev. Stat. 1989, ch. 38, pars. 20—1(a), 20—

1.1(a).) An offense is a lesser included offense if all its elements are included in the greater offense, making the commission of the greater offense impossible without simultaneously committing the lesser offense as well. (Ill. Rev. Stat. 1989, ch. 38, par. 2—9(a); *People v. Shum* (1987), 117 Ill. 2d 317, 364, 512 N.E.2d 1183, 1202.) In other words, when each has an element not contained in the other, no lesser included offense relationship exists. First degree murder requires the death of an individual; aggravated arson does not. Aggravated arson requires the use of fire or explosives; first degree murder does not. Further, both first degree murder and aggravated arson can clearly be committed without committing the other. Therefore, under the circumstances of this case, we hold that aggravated arson was not a lesser included offense of first degree murder.

Because in this case aggravated arson was not a lesser included offense in first degree murder, *King* is inapposite. The supreme court similarly distinguished *King* in *Shum*, in part because it found feticide not to be lesser included in murder. (*Shum*, 117 Ill. 2d at 363, 512 N.E.2d at 1202.) In *Shum*, the defendant was convicted of both feticide and murder based upon his single shot killing both a woman and her fetus. The court agreed with the defendant that both convictions rested upon a single act. However, the court found that because feticide was not lesser included in murder, separate convictions for both offenses were proper even though based upon a single act. *Shum*, 117 Ill. 2d at 363, 512 N.E.2d at 1202; see also *People v. Campos* (1992), 227 Ill. App. 3d 434, 452, 592 N.E.2d 85, 97 (defendant properly convicted of both first degree murder and intentional homicide of unborn child based upon single act).

In *People v. Mercado* (1983), 119 Ill. App. 3d 461, 462-63, 456 N.E.2d 331, 332, the court similarly affirmed separate convictions for different offenses arising out of a single act or course of conduct. In *Mercado*, the defendant killed three people while driving drunk. He was convicted of reckless homicide and driving under the influence of alcohol (DUI). He contended on appeal that his DUI conviction must be vacated because it arose out of the same act supporting the reckless homicide convictions. The court disagreed and held that reckless homicide and DUI each requires an element the other does not. (*Mercado*, 119 Ill. App. 3d at 463-64, 456 N.E.2d at 333.) "Driving under the influence convictions can rest solely on the defendant driving a motor vehicle while under the influence. Reckless homicide requires a reckless operation of the vehicle and a resulting death." (*People v. Hanks* (1988), 174 Ill. App. 3d 555, 561, 528 N.E.2d 1044, 1048 (Lund, J., concurring in part and dissenting in part).) Thus, nei-

ther offense is lesser included in the other, and the court held that convictions for both reckless homicide and DUI were proper. *Mercado*, 119 Ill. App. 3d at 463-64, 456 N.E.2d at 333; see also *People v. Trimble* (1991), 220 Ill. App. 3d 338, 348, 580 N.E.2d 1209, 1214-15 (defendant's convictions for home invasion and murder based upon the same act can stand because "neither home invasion nor murder is a lesser included offense of the other"); *People v. Garza* (1984), 125 Ill. App. 3d 182, 188-89, 465 N.E.2d 595, 600-01 (defendant properly convicted of both home invasion and rape based upon the same act as neither is lesser included in the other); *cf. People v. Watkins* (1988), 172 Ill. App. 3d 168, 171, 526 N.E.2d 448, 450 (defendant properly convicted of both unlawful possession of a controlled substance with intent to deliver and unlawful possession of a look-alike substance with intent to distribute because each is a distinct statutory offense).

The same principle applies here. Defendant was convicted of aggravated arson and first degree murder. Each of these offenses required an element the other did not. Thus, no lesser included offense relationship exists. (See *Shum*, 117 Ill. 2d at 364, 512 N.E.2d at 1202.) The present case is logically indistinguishable from *Mercado* and, to some degree, *Shum*. Their holdings dictate the result here. We hold that defendant's aggravated arson conviction was proper.

### F. *Extended-Term Sentences*

Defendant finally argues that the trial court erred in imposing extended-term sentences on his aggravated arson, residential burglary, attempt (robbery), and felony theft convictions. He notes that the language of the extended-term statute permits the imposition of an extended sentence only on the most serious class of offense. (See Ill. Rev. Stat. 1989, ch. 38, par. 1005—8—2(a); *People v. Jordan* (1984), 103 Ill. 2d 192, 205-06, 469 N.E.2d 569, 575.) Because first degree murder is the most serious class of offense of which he was convicted, defendant contends that the extended-term sentences imposed on his other convictions were erroneous.

We initially note that the trial court is vested with broad discretion in imposing an appropriate sentence upon a defendant, and this court will not reverse unless the sentence imposed by the trial court constitutes an abuse of discretion. (*People v. Nussbaum* (1993), 251 Ill. App. 3d 779, 780-81, 623 N.E.2d 755, 757.) The decision to impose an extended-term sentence also rests with the trial court's discretion. *People v. Kelchner* (1991), 221 Ill. App. 3d 25, 32, 581 N.E.2d 793, 798.

The trial court sentenced defendant to natural life in prison on

the first degree murder convictions. It also entered judgment and imposed extended-term sentences on several lesser offenses. Aggravated arson is a Class X felony. (Ill. Rev. Stat. 1989, ch. 38, par. 20—1.1(b).) Residential burglary is a Class 1 felony. (Ill. Rev. Stat. 1989, ch. 38, par. 19—3(b).) Because the victims in this case were over 60 years old, the attempt (robbery) was a Class 2 felony. (Ill. Rev. Stat. 1989, ch. 38, pars. 8—4(c)(3), 18—1(b).) Felony theft is a Class 3 felony. Ill. Rev. Stat. 1989, ch. 38, par. 16—1(b)(4).

In *People v. Young* (1988), 124 Ill. 2d 147, 165-66, 529 N.E.2d 497, 505, the supreme court considered whether a murder defendant sentenced to natural life in prison was entitled to vacation of the extended-term sentence imposed on a lesser conviction. The defendant in *Young* presented the identical argument presented here. The *Young* court, however, held that "the statute allows the imposition of an extended-term sentence for the class of the most serious offense of which the defendant was convicted other than murder, even though the defendant was also separately sentenced to natural life imprisonment on the murder conviction." *Young*, 124 Ill. 2d at 166, 529 N.E.2d at 506.

Having previously concluded that defendant's aggravated arson conviction can stand, the trial court could properly impose an extended-term sentence on it because it is the most serious class of offense of which defendant was convicted other than first degree murder. (See *Jordan*, 103 Ill. 2d at 205-06, 469 N.E.2d at 575.) Furthermore, we find that defendant was also eligible for extended-term sentences on his other convictions.

We note that where separate convictions involve unrelated conduct, the trial court can properly impose extended-term sentences on each, regardless of whether the court imposes the sentences at one hearing. (*People v. Lewis* (1992), 228 Ill. App. 3d 654, 659, 592 N.E.2d 671, 674.) The defendant in *Lewis* was sentenced to extended-term sentences for both residential burglary and felony theft. Although each offense arose out of a separate incident, the trial court conducted one sentencing hearing to dispose of both matters together. On appeal, the defendant argued that *Jordan* prohibited an extended-term sentence on his conviction for felony theft, the lesser of his two convictions. This court distinguished *Jordan* and its progeny, noting that those cases involved "extended-term sentences on lesser offenses which arose out of the same conduct as the greater offenses for which [defendants] were also given extended-term sentences." *Lewis*, 228 Ill. App. 3d at 659, 592 N.E.2d at 674.

●8 The same principle applies here. Defendant's conviction for aggravated arson involved his actions the night he burned the

Johnsons' home. Conversely, defendant's conviction for residential burglary was based upon his conduct at a later, unconnected time—when he at some point between September 23 (the date of the murder/arson) and October 12, 1990, returned to the Johnsons' residence and stole a lawnmower. Thus, the extended-term sentence for aggravated arson did not prohibit the trial court from also imposing an extended-term sentence on the residential burglary conviction. See *Lewis*, 228 Ill. App. 3d at 659, 592 N.E.2d at 674.

Defendant's conviction for felony theft is also unrelated to the events underlying his other convictions. Defendant was convicted of felony theft for stealing copper wire from CSX Transportation on or about October 31, 1990. Obviously, this theft was also completely unrelated to either earlier event at the Johnson home. Accordingly, defendant's extended-term sentence imposed on the felony theft conviction was not improper. See *Lewis*, 228 Ill. App. 3d at 659, 592 N.E.2d at 674.

Finally, the conduct underlying defendant's conviction for attempt (robbery) is also sufficiently separate from that underlying the aggravated arson conviction to support the imposition of an extended-term sentence. After entering the house, defendant threatened to set Mrs. Johnson on fire unless Mr. Johnson gave him some money. This act formed the basis of defendant's attempt (robbery) conviction. Shortly thereafter, defendant set the fires that ultimately burned the house and killed the Johnsons. While these two courses of conduct were in close proximity, they were distinct, and defendant's conviction of aggravated arson does not preclude the imposition of an extended-term sentence on defendant's conviction for attempt (robbery). (See *Lewis*, 228 Ill. App. 3d at 659, 592 N.E.2d at 674.) Thus, we conclude that the trial court's imposition of extended-term sentences on each of these convictions was not an abuse of discretion. See *Kelchner*, 221 Ill. App. 3d at 32, 581 N.E.2d at 798.

## III. CONCLUSION

For the reasons stated, we affirm defendant's convictions and sentences.

Affirmed.

KNECHT, J., concurs.

JUSTICE COOK, specially concurring:
The trial court imposed a sentence of natural life in prison for

the two first degree murders and a consecutive sentence of 60 years for the aggravated arson.

The legislature has determined in which cases consecutive sentences may be imposed:

> "The court shall not impose consecutive sentences for offenses which were committed as part of a single course of conduct during which there was no substantial change in the nature of the criminal objective, unless, one of the offenses for which defendant was convicted was a Class X or Class 1 felony and the defendant inflicted severe bodily injury, or where the defendant was convicted of a violation of Section 12—13 or 12—14 of the Criminal Code of 1961, in which event the court shall enter sentences to run consecutively." (Ill. Rev. Stat. 1989, ch. 38, par. 1005—8—4(a).)

The aggravated arson here was a Class X felony (Ill. Rev. Stat. 1989, ch. 38, par. 20—1.1(b)), and severe bodily injury was imposed. Therefore, it is not necessary under section 5—8—4(a) of the Unified Code of Corrections (Code) (Ill. Rev. Stat. 1989, ch. 38, par. 1005—8—4(a)) to consider whether there was a substantial change in the nature of the criminal objective. Consecutive sentences are mandatory under the statute. See *People v. Bole* (1993), 155 Ill. 2d 188, 198, 613 N.E.2d 740, 745.

The supreme court's statement in *King* regarding instances "where more than one offense is carved from the same physical act" addresses the imposition of concurrent sentences, and has nothing to do with consecutive sentences. The only reason *King* addressed concurrent sentences was because the legislature had not done so. If *King* did apply here I would disagree with the majority's statement that "[t]he court in *King* held that a defendant cannot be convicted of multiple offenses based upon a single act where some of those convictions are, by definition, lesser included in another." (265 Ill. App. 3d at 149.) *King* set out separate rules for situations where a single act is involved, and for situations involving multiple acts and lesser included offenses. See *People v. Yeast* (1992), 236 Ill. App. 3d 84, 88, 601 N.E.2d 1367, 1369-70; *People v. Bowen* (1993), 241 Ill. App. 3d 608, 628, 609 N.E.2d 346, 361-62.

The one-act-one-crime rule applies only where the charges involve precisely the same physical act. (*People v. Segara* (1988), 126 Ill. 2d 70, 77, 533 N.E.2d 802, 805; *People v. Myers* (1981), 85 Ill. 2d 281, 289, 426 N.E.2d 535, 538 (two separate invasions of victim's body, even though closely related, were not one physical act); see *People v. Cobern* (1992), 236 Ill. App. 3d 300, 303, 603 N.E.2d 693, 695 (test for determining whether separate acts involved).) A single act can

result in multiple convictions if there are multiple victims. *Shum*, 117 Ill. 2d at 363, 512 N.E.2d at 1201.

Only if a court gets past the one-act-one-crime rule is it necessary to consider *King*'s multiple act/lesser included offense rule. In *Shum*, defendant was sentenced to death for the murder of Grace Whipple and was sentenced to a concurrent prison term for the feticide of Whipple's unborn child. The supreme court first addressed the one-act-one-crime rule and determined that it did not apply (in effect, that there was not just a single act) where there were two distinct victims. (*Shum*, 117 Ill. 2d at 363, 512 N.E.2d at 1201.) Only then did the court go on to consider whether feticide was a lesser included offense of murder, concluding that it was not. *Shum*, 117 Ill. 2d at 364, 512 N.E.2d at 1202.

Again, the question whether consecutive sentences are permissible is controlled by section 5—8—4(a) of the Code, and not by *King*. Beyond the statute, is there any constitutional problem with consecutive sentences in this case? The double jeopardy clause provides "nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb." (U.S. Const., amend. V.) It has been held that the clause "protects against multiple punishments for the same offense." (*North Carolina v. Pearce* (1969), 395 U.S. 711, 717, 23 L. Ed. 2d 656, 665, 89 S. Ct. 2072, 2076.) It has further been held that a lesser included offense is the "same offense." (*Blockburger v. United States* (1932), 284 U.S. 299, 304, 76 L. Ed. 306, 309, 52 S. Ct. 180, 182.) *Pearce* and *Blockburger*, however, have most recently been held to state only rules of statutory construction, not of constitutional limitation. *Missouri v. Hunter* (1983), 459 U.S. 359, 366, 74 L. Ed. 2d 535, 542, 103 S. Ct. 673, 678 ("With respect to cumulative sentences imposed in a single trial, the Double Jeopardy Clause does no more than prevent the sentencing court from prescribing greater punishment than the legislature intended").

The one-act-one-crime rule has never been viewed as a rule of constitutional dimension. (*Blockburger*, 284 U.S. at 304, 76 L. Ed. at 309, 52 S. Ct. at 182 (where single act violates two statutes, double punishment proper if each statute requires proof of an additional fact which the other does not); *King*, 66 Ill. 2d at 565, 363 N.E.2d at 844.) If the legislature so intended, a single physical act could support multiple convictions. See *People v. Donaldson* (1982), 91 Ill. 2d 164, 168, 435 N.E.2d 477, 479 (legislature did not so intend when it enacted the armed violence statute).

There may, however, be a constitutional bar to multiple punishments for a greater offense and a lesser included offense where only a single physical act (section 5—8—4(a) of the Code refers to a "single

course of conduct") is involved. (See Eisenberg, *Multiple Punishments for the "Same Offense" in Illinois*, 11 S. Ill. U. L.J. 217, 249 nn.210, 260 (1987) (hereinafter Eisenberg); see *People v. Davis* (1993), 156 Ill. 2d 149, 160, 619 N.E.2d 750, 756; *cf. Hunter*, 459 U.S. at 366, 74 L. Ed. 2d at 542, 103 S. Ct. at 678 (no constitutional limitation on legislature).) Where a defendant chooses to commit murder by conduct which is itself a crime, such as arson, why should defendant not be punished for both crimes? For that reason the term "lesser included offense" has been defined strictly, to include only those situations where proof of the greater offense must necessarily prove the lesser included offense—where the statutory elements of the greater offense include all those of the lesser. (*Illinois v. Vitale* (1980), 447 U.S. 410, 416, 65 L. Ed. 2d 228, 235, 100 S. Ct. 2260, 2265; *Shum*, 117 Ill. 2d at 363-64, 512 N.E.2d at 1202.) Not many offenses are lesser included offenses under that strict test. Professor Eisenberg argues that, under the strict test, even the predicate offense of a compound offense such as armed violence is not a lesser included offense. Eisenberg, 11 S. Ill. U. L.J. at 252-53.

As the majority correctly determines, arson is not a lesser included offense of murder in this case. It is not necessary to commit arson, or any other separate crime, in order to commit murder. Accordingly, there can be no constitutional problem with the application of section 5—8—4(a) of the Code, and consecutive sentences are mandatory in this case.